**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

CHRISTA L. PETERSON,

             Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC.; EQUIFAX
INFORMATION SERVICES, LLC,

             Defendants.

**Case No. 20-cv-00606 (DSD/ECW)**

**DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

This case is a simple one. Plaintiff claims Experian violated § 1681e(b) of the Fair Credit Reporting Act ("FCRA") and failed to employ reasonable procedures to assure maximum possible accuracy, simply because Experian did not immediately divine that Plaintiff's Southpoint Federal Credit Union ("SFCU") Account No. *3776 (the "*3776 account") was discharged in her Chapter 7 bankruptcy. Neither SFCU, nor Plaintiff, ever informed Experian of that fact—which is troubling given that both SFCU and Plaintiff were party to Plaintiff's bankruptcy proceedings, while Experian was not.

Nonetheless, this case actually demonstrates the reasonableness of Experian's procedures for reporting consumer debts following a Chapter 7 bankruptcy. Despite having never been notified that the *3776 account was included in Plaintiff's bankruptcy, Experian automatically updated the account to report as discharged in bankruptcy with no balance

on October 7, 2019—about three months after Plaintiff's bankruptcy discharge and nearly five months before Plaintiff filed this lawsuit.  The *3776 account was updated as a result of Experian's automated procedures, known as a "bankruptcy scrub," because it met a set of established criteria indicating that the account was likely included and discharged in bankruptcy.  Importantly, that update occurred in spite of continued reporting from SFCU that the account was not included in Plaintiff's bankruptcy. Equally as important, Experian updated the account to report as Plaintiff desired despite having received no contact from Plaintiff, even though she was led to believe her attorneys would contact Experian to submit a dispute on her behalf before forcing her to endure the stress of litigation.  (*See* Declaration of Christopher Hall ("Hall Decl.") Exhibit A, Deposition of Christa Peterson, at 69:23–71:10, 79:13–80:8, 148:3–9.)[1]

Plaintiff's claim that Experian failed to employ reasonable procedures is untenable. Experian's automated procedures (as well as the assumptions that underpin them) are mandated by a federal injunction imposed on Experian in the long-running *White v. Experian Information Solutions, Inc.*, No. 8:05-cv-01070-DOC-MLG  (C.D. Cal.) case. Importantly, that injunction (the "*White* Order") expressly provides that the procedures

---

[1] Indeed, despite discovering the error on or around August 30, 2019, Plaintiff (and her attorneys) waited nearly six months before suing Experian in federal court, claiming some entitlement to damages.  At no time did Plaintiff (or her attorneys) contact Experian to dispute the *3776 account, which, had it been received during the brief window of time before the account was automatically updated, would have resulted in the update Plaintiff was seeking.  (*See* Declaration of Kimberly Cave ("Cave Decl."), at ¶ 29); *see also* 15 U.S.C. § 1681i(a).

contained therein are "conclusively deemed to comply with the FCRA, including but not limited to Section 1681e(b)[.]"  (Hall Decl. Ex. B, *White* Order, at ¶ 5.4).

This case is an obvious attempt to relitigate the reasonableness of those procedures and the conclusions of a sister Court.  But there is no evidence to show that these procedures are unreasonable.  Indeed, the *White* Court expressly held to the contrary, and Experian goes above and beyond the requirements of that Order to ensure the maximum possible accuracy of the information it reports about consumers, such as Plaintiff.  (*Id.*; Hall Decl. Ex. C, Cave Expert Report, at 17–20.)  Moreover, Plaintiff has not presented any evidence of actual damages, and the record is devoid of any credit denials based on Experian's reporting or actionable emotional distress.  In light of that failure, Experian is entitled to summary judgment in its favor.

## BACKGROUND

## I.    THE LEGAL LANDSCAPE.

### A.    The Fair Credit Reporting Act

The FCRA seeks "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  It requires credit reporting agencies ("CRAs"), such as Experian, to "follow reasonable procedures to assure maximum possible accuracy" of information in consumer reports. 15 U.S.C. § 1681e(b).  CRAs are those entities who assemble consumer credit information to provide consumer reports to third parties.  *Id.* § 1681a(f).  CRAs simply "collect consumer information supplied by furnishers, compile it into consumer reports, and provide those reports to authorized users."  *Denan v. Trans Union LLC*, 959

F.3d 290, 295 (7th Cir. 2020); *see also* S. Rep. No. 103-209, 1993 WL 516162, at *6 (1993) (explaining that "it is creditors and other furnishers of information, not [CRAs], that have direct access to the facts of a given credit transaction. Ordinarily, the creditor is best situated to determine whether the information it reported was inaccurate or incomplete and to ensure its correction.").

In enacting the FCRA, Congress recognized that credit reporting is not an exact science because of the sheer amount of information involved. *See*, *e.g.*, *Anderson v. Trans Union LLC*, 367 F. Supp. 2d 1225, 1228–29, 1237 (W.D. Wis. 2005) (noting that the defendant CRA maintained credit files on approximately 200 million consumers and processed billions of records per month); *Anderson v. Trans Union LLC*, 345 F. Supp. 2d 963, 966 (W.D. Wis. 2004) (noting that the defendant CRA issued approximately two million consumer reports each day). In light of that immense volume of information, Congress was mindful that the credit reporting system would "never be perfectly accurate." S. Rep. No. 103-209, 1993 WL 516162, at *18. That is directly reflected in § 1681e(b)'s standard, which does not mandate that CRAs achieve "maximum possible accuracy," but rather that they "follow reasonable procedures" aimed at doing so.

Congress has long recognized that consumer disputes play a crucial role in ensuring that a consumer's credit file is accurate. Consumers can obtain complete copies of the information in their credit files to assess the accuracy of the information. 15 U.S.C. § 1681g. If consumers find inaccurate information, they can dispute the information with the CRA or directly with the furnisher of that information. *Id.* §§ 1681i(a), 1681s-2(a)(8); (Hall Decl. Ex. C, Cave Expert Report, at 4, 8–10.) Congress has characterized the

consumer dispute process as "the heart of [its] efforts to ensure the ultimate accuracy of consumer reports[.]"  S. Rep. No. 103-209, 1993 WL 516162, at *18 ("[S]ection [1681i] is designed to ensure that consumers are able to address problems and correct errors in a timely fashion.").

Courts have likewise long-stressed the importance of the dispute process, explaining that "[a] credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice. . . . When a [CRA] receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 286–87 (7th Cir. 1994) (upholding dismissal of § 1681e(b) claim, but remanding § 1681i claim); *see also Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("[O]nce a claimed inaccuracy is pinpointed, a [CRA] conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information.  In short, when one goes from the § 1681e(b) investigation to the § 1681i(a) *re* investigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly.").

Federal regulatory bodies have likewise stressed the key role consumers play in disputing inaccurate information.  (*See*, *e.g*., Hall Decl. Ex. D, Credit Reports: Consumers' Ability to Dispute and Change Inaccurate Information, at 9–10 (statement of Lydia Parnes, Director, Bureau of Consumer Protection, Federal Trade Commission) ("[W]e have sought to protect consumers' right to receive a free credit report so that they can have a greater and more meaningful opportunity to spot and correct errors in their credit reports."); *id*. at

10–11 (statement of Sandra F. Braunstein, Director, Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System) ("Congress concluded that more needed to be done to enhance the accuracy of consumer reports and improve the dispute process. The FACT Act amended the FCRA to give consumers the right to request a free annual copy of their credit reports from each of the credit bureaus. This change allows consumers to play a more active role in monitoring the accuracy of their credit reports.").); *see also* Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition, at 2 (Winter 2017), http://files.consumerfinance.gov/f/documents/201703_cfpb_Supervisory-Highlights-Consumer-Reporting-Special-Edition.pdf ("[O]ur vision of a consumer reporting system [is] a system where furnishers provide and [CRAs] maintain and distribute data that are accurate, supplemented by an effective and efficient dispute management and resolution process for consumers.").

## B.     Chapter 7 of the U.S. Bankruptcy Code

"Chapter 7 of the Bankruptcy Code . . . permits insolvent debtors to discharge their debts by liquidating assets to pay creditors." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799–800 (2019) (citing 11 U.S.C. §§ 704(a)(1), 726); *see also* Chapter 7 - Bankruptcy Basics, United States Courts, http://www.uscourts.gov/services-forms/bankruptcy/bankruptcy-basics/chapter-7-bankruptcy-basics (last visited Apr. 25, 2021) (hereinafter "Chapter 7 Bankruptcy Basics"). Chapter 7 bankruptcy cases do "not involve the filing of a plan of repayment as in chapter 13. Instead, the bankruptcy trustee gathers and sells the debtor's nonexempt assets and uses the proceeds of such assets to pay holders of claims (creditors)

in accordance with the provisions of the Bankruptcy Code." Chapter 7 Bankruptcy Basics, *supra*.

Once that process is completed, the bankruptcy court typically enters a discharge order that prevents creditors from taking any collection actions against the debtor. *See* 11 U.S.C. § 524, 727. Not all debts are discharged in Chapter 7 bankruptcy, and there are several statutory exceptions to discharge. 11 U.S.C. § 523; *accord* Chapter 7 Bankruptcy Basics, *supra*. The discharge order does not typically list the specific debts subject to the discharge injunction. (*See*, *e.g.*, Hall Decl. Ex. E, Plaintiff's Discharge Order, at 1–2.)

Debtors are therefore advised to consult with an attorney to determine the scope of discharge. *See*, *e.g.*, Chapter 7 Bankruptcy Basics, *supra* ("Because a chapter 7 discharge is subject to many exceptions, debtors should consult competent legal counsel before filing to discuss the scope of the discharge."); *accord* (Hall Decl. Ex. E, Plaintiff's Discharge Order, at 2 ("Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.").) Nothing in the Bankruptcy Code requires creditors to close a debtor's accounts, and debtors are expressly advised that they are free to voluntarily repay discharged debts. (*See, e.g.*, *id.* at 1.)

## II.   MATERIAL FACTS NOT IN DISPUTE.

### A.   Experian's Procedures For Reporting Chapter 7 Bankruptcies.

In reporting consumer bankruptcy information, Experian relies on three sources of information—(1) LexisNexis Risk Data Management Inc. ("Lexis"), its public records furnisher, (2) data furnishers, who are parties to the bankruptcy proceedings, and (3) consumers, such as Plaintiff—to ensure the maximum possible accuracy of the information

it reports about consumer debts, including those subject to a Chapter 7 bankruptcy.  (Cave Decl. ¶ 10–12; Hall Decl. Ex. C, Cave Expert Report, at 3–4, 7–8.)  Following a consumer's discharge from a Chapter 7 bankruptcy, Experian also employs an automated procedure (the "bankruptcy scrub"), which updates particular accounts in a consumer's credit file to report as discharged in bankruptcy with no balance when those accounts meet certain established criteria.  (Cave Decl. ¶ 13–17; Hall Decl. Ex. C, Cave Expert Report, at 15–20.)  That scrub helps ensure that consumer debts are correctly reported, even absent notice from the furnisher or consumer that the debt was included in bankruptcy.  (Cave Decl. ¶ 13.)

*Public Records Furnisher*.  Experian obtains public record information related to a consumer's Chapter 7 bankruptcy from Experian's public records vendor, Lexis.  (Cave Decl. ¶ 11.)  Lexis provides the consumer's name, type of bankruptcy filed, date of the bankruptcy filing, and bankruptcy court.  (*Id*.)  Lexis also informs Experian when a consumer's Chapter 7 bankruptcy has been discharged.  (*Id*.)

*Data Furnishers*.  Experian obtains consumer credit information from data furnishers (also known as "subscribers").  (*Id*. ¶ 7.)  Before Experian will accept consumer credit data from a particular furnisher, that furnisher must undergo a vetting process.  (*Id*.)  As part of that process, Experian investigates the potential furnisher.  (*Id*.)  Experian also requires the furnisher to sign a contract requiring them to report accurate information to Experian.  (*See id*.)  Experian does not report information from sources—including furnishers—it believes are unreliable.  (*Id*.)

Data furnishers can report bankruptcy information about a particular debt.  At the tradeline (account) level, the bankruptcy status of a particular debt is reported using a Consumer Information Indicator ("CII") code.  (*Id.* ¶ 10.)  For Chapter 7 bankruptcies, data furnishers can report a CII of "A" to indicate that a debt was included in a consumer's bankruptcy petition, and a CII of "E" to indicate that debt has been discharged.  (*Id.*)

*Consumers.*  Experian also relies on individual consumers to inform Experian that an account has been included in, or discharged through, their bankruptcy.  (*Id.* ¶ 12.)  When a consumer contacts Experian directly to inform Experian that an account was included in or discharged in their bankruptcy, Experian will review the consumer's file and determine if the consumer's bankruptcy is on file.  (*Id.*)  If so, Experian will update any tradeline that the consumer claims was included in their bankruptcy provided that the account (1) was opened before the consumer filed for bankruptcy and (2) is a generally dischargeable account type.  (*Id.*)  Once Experian applies these changes, it notifies both the consumer and the data furnisher of the changes made.  (*Id.*)  Consumers can request this kind of update online, by mail, or through a toll-free phone number.  (Hall Decl. Ex. F, Plaintiff's August 30, 2019, Disclosure, at 1.)

*The* White *Order.*  As a result of the permanent injunction entered in the long-running *White* litigation, Experian is also required to make certain assumptions about particular debts that are likely included in a consumer's Chapter 7 bankruptcy.  (*See* Cave Decl. ¶ 13; Hall Decl. Ex. C, Cave Expert Report, at 11–20.)  Those assumptions are known internally as Experian's "bankruptcy scrub."  (Cave Decl. ¶ 13.)  Specifically, the *White* Order requires Experian "to assume that certain categories of pre-bankruptcy consumer

debts have been discharged in Chapter 7 bankruptcies based on the statistical likelihood of discharge of these categories of debt, and without either the creditors or Consumers reporting the debt to Defendants as having been discharged." (Hall Decl. Ex. B, *White* Order, at ¶ 5.1; *see also* Hall Decl. Ex. C, Cave Expert Report, at 11–15). The *White* Order also requires that Experian *exclude* certain debts from its bankruptcy scrub, including those accounts—like the one at issue here—with a "Current Status" when the consumer files bankruptcy (or when the update is made).[2] (Hall Decl. Ex. B, *White* Order, at ¶¶ 3.2(b)(ii)(E); 3.2(c)(ii)(E); *see also* Hall Decl. Ex. C, Cave Expert Report, at 11–15.) In other words, Experian must try to exclude debts that are reporting in a "Current Status" from the updates required by the *White* Order. (*Id*.) Relatedly, the *White* Order expressly preserved consumers' ability to dispute inaccuracies that occurred or remained in a consumer's credit file despite those assumptions, and the court retained jurisdiction to resolve future disputes arising out of its terms. (Hall Decl. Ex. B, *White* Order, at ¶¶ 3.7, 9.5.)

*The Bankruptcy Scrub.* Experian applies its bankruptcy scrub in two steps. (Cave Decl. ¶ 14; Hall Decl. Ex. C, Cave Expert Report, at 15–20.) The first step expressly incorporates the requirements of the *White* Order. (Cave Decl. ¶ 14; Hall Decl. Ex. C, Cave Expert Report, at 11–17.) That "initial" bankruptcy scrub runs within eight days of a notification from Lexis that the consumer's bankruptcy has been discharged. (Cave Decl.

---

[2] "Current Status" means that, "as of the date of last reporting, there is no outstanding, overdue, and delinquent balance currently due" on the account. (Hall Decl. Ex. B, *White* Order, at ¶ 2.10.)

¶ 14.)   The initial scrub automatically evaluates the consumer's credit file and adds a CII code to particular, qualifying debts as outlined in the *White* Order to cause them to report as discharged in bankruptcy and with no balance.  (*Id*.; Hall Decl. Ex. C, Cave Expert Report, at 15–17.)  The scrub excludes debts that are in a current status at the time of a consumer's bankruptcy unless those debts are more than ninety days delinquent when the scrub executes.[3]  (Cave Decl. ¶ 14; Hall Decl. Ex. C, Cave Expert Report, at 11–17.)  That threshold distinguishes consumers who intend to keep making payments on a particular debt from those who have stopped paying the debt and are treating it as discharged.  (Cave Decl. ¶ 15; Hall Decl. Ex. C, Cave Expert Report, at 19; *see also* Hall Decl. Ex. B, *White* Order, at ¶ 5.1.).

As part of the second step of its bankruptcy scrub, Experian continues to monitor affected files following a bankruptcy discharge.  (Cave Decl. ¶ 16; Hall Decl. Ex. C, Cave Expert Report, at 17–19.)  Although not required by the *White* Order, Experian conducts this "look-back" bankruptcy scrub on the first Monday of every other month for an eighteen month period following the bankruptcy discharge.[4]  (Cave Decl. ¶ 16.)  The look-back scrub will update any pre-bankruptcy debt reporting as more than ninety days delinquent, regardless of its status at the time the bankruptcy was filed.  (*Id.*)  For any account meeting

---

[3] In April 2021, long after the facts at issue in this case, Experian updated its scrub procedures to apply these updates to accounts reporting as thirty or more days delinquent. (Cave Decl. ¶¶ 14, 16.)

[4] In February 2021, Experian began running its "look-back" scrub on a monthly basis.  (Cave Decl. ¶ 16.)

that criteria, Experian will update the account to report as discharged in bankruptcy and with no balance.  (*Id.*)

The look-back scrub thus catches any pre-bankruptcy accounts that were excluded from the initial scrub because they were current, but later progressed to more than ninety days delinquent, indicating that the consumer was no longer making payments on the account.  (*Id.* ¶¶ 15–16.)   As the *White* court was aware, consumers commonly choose to maintain debts through their Chapter 7 bankruptcy and often incur new, post-petition debt on pre-bankruptcy accounts that is not subject to discharge.  (Hall Decl. Ex. G, *White* Memorandum in Support of Settlement, at 9–10; *see also* Hall Decl. Ex. C, Cave Expert Report, at 19.)  Importantly, a delinquency of thirty, sixty, or ninety days is generally less harmful to a consumer's creditworthiness than the derogatory status of discharged in bankruptcy.  (Cave Decl. ¶ 15; Hall Decl. Ex. C, Cave Expert Report, at 19.)  Likewise, in many credit-scoring models, debts that are less than 120 days delinquent are not considered derogatory, (*see* Cave Decl. ¶ 15), but debts more than 120 days are, as reflected in the *White* Order's distinction of minor and major delinquencies, (Hall Decl. Ex. B, *White* Order, at ¶¶ 2.25, 2.26.)

## B.    Plaintiff's *3776 Account and Chapter 7 Bankruptcy.

Plaintiff has had several accounts with SFCU.  Only the *3776 account is at issue here.  (*See* Complaint ¶¶ 14–15, Dkt. No. 1.)  Plaintiff opened the *3776 account in November 2016.  (Cave Decl. ¶ 22.)  Between November 2016 and July 2018, SFCU reported that Plaintiff was current on that account.  (*Id.*)  In August 2018, SFCU reported that Plaintiff was 30 days past due.  (*Id.*)  It also reported that Plaintiff was 60 days past

due in September 2018. (*Id*.) SFCU then reported that Plaintiff was current on the *3776 account between October 2018 and March 2019, when she filed for bankruptcy. (*Id.*)

Plaintiff filed a Chapter 7 bankruptcy petition on March 25, 2019. (Compl. ¶ 11.) That petition listed the *3776 account as an unsecured claim of $2,349.00. (Hall Decl. Ex. H, Plaintiff's Bankruptcy Petition, at 23.) Experian received notice of the bankruptcy from Lexis on March 26, 2019. (Cave Decl. ¶ 19.)

Plaintiff received a discharge order on June 26, 2019. (Hall Decl. Ex. E, Plaintiff's Discharge Order, at 1–2.) That order does not specify which of Plaintiff's debts were discharged. (*Id.* at 2.) Instead, it lists categories of debts that are not discharged, emphasizes that the order "is only a general summary of the bankruptcy discharge," and cautions that "some exceptions exist. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case." (*Id.*)

Experian received notice of Plaintiff's discharge from Lexis on June 27, 2019. (Cave Decl. ¶ 20.) At the time of Plaintiff's discharge, SFCU was reporting that the account was only 30 days late. (*Id.* ¶ 23.) Indeed, SFCU did not even report a status other than current until June 1, 2019. (*Id.*) At no time prior to the filing of Plaintiff's Complaint, did SFCU report that the *3776 account was included in, or discharged through, Plaintiff's bankruptcy. (*Id.* ¶ 28.)

## C.   Plaintiff's August 30, 2019, Disclosure and Experian's Reporting of the *3776 Account

On March 19, 2019, Plaintiff authorized her bankruptcy attorneys, Hoglund Law Offices, to obtain her credit reports. (Hall Decl. Ex. I, Hoglund Authorization Form, at 1.)

In doing so, Plaintiff agreed that she needed to "complete a dispute process before any potential claims can be ascertained." (*Id.*) Only after this dispute process was complete did Plaintiff authorize referring her case to another firm for potential litigation. (*See id.*)

On or around August 30, 2019, Plaintiff obtained a copy of her Experian consumer disclosure. (Compl. ¶ 13.) Based on information received from SFCU, Experian reported the *3776 account as shown:



(Hall Decl. Ex. F, Plaintiff's August 30, 2019, Disclosure, at 3–4.)

The August 2019 disclosure also listed Plaintiff's bankruptcy information, and included information about fifteen other accounts that were reporting as included or discharged through Plaintiff's bankruptcy. (*Id.* at 1–5.) That disclosure also explained that Plaintiff could dispute any information she believed was inaccurate, either online, by mail, or by phone. (*Id.* at 1.) In fact, it contained a pre-filled dispute form that included the option to dispute an account as included in bankruptcy. (*Id.* at 17.)

At her deposition, Plaintiff admitted she knew—even before filing for bankruptcy—that consumers could contact Experian to dispute information contained in their credit reports.  (*See* Hall Decl. Ex. A, Deposition of Christa Peterson, at 62:2–10.)  When asked why she did not contact Experian to dispute the SFCU account, Plaintiff explained "it wasn't [her] job," and that she expected her attorneys to do so.  (*See id*. at 63:20–23, 69:23–71:10.)

Nearly six months after discovering the alleged error, Plaintiff sued Experian and Equifax in federal court.  (*See* Cave Decl. ¶ 28; Compl. ¶¶ 13–22.)  Plaintiff alleged that Experian violated § 1681e(b), either willfully or negligently, by failing to maintain reasonable procedures to ensure maximum possible accuracy of the information it reported about her.  (Compl. ¶¶ 31, 33.)  At the time Plaintiff filed her Complaint, Experian had been correctly reporting the *3776 account as discharged in bankruptcy with no balance for nearly five months.  (Cave Decl. ¶ 27; *see also* Hall Decl. Ex. J, Plaintiff's March 25, 2020, Disclosure, at 3.)

### D.   Plaintiff's Damages

Plaintiff alleged that she "sustained damages including the loss of credit opportunities, denials, and favorable credit terms, emotional distress, humiliation, and mental anguish."  (Compl. ¶ 32.)  Plaintiff has not produced any credit denials based on Experian's reporting of the *3776 account in this case.  Plaintiff has offered no evidence other than her own testimony to support her claims of emotional damages.  Plaintiff, however, admits that she has not met with, or been examined by, any medical doctors, psychologists, psychiatrists, spiritual advisors, or mental health professionals, as a result

of Experian's credit reporting. (Hall Decl. Ex. K, Plaintiff's Responses to Experian's Requests for Admission, at 4-5). Plaintiff also admits that she has not incurred any expenses in connection with medical, spiritual or counseling treatment as a result of Experian's credit reporting. (*Id.*)

## III.   PLAINTIFF'S CLAIM AGAINST EXPERIAN.

Plaintiff alleges only one claim: that Experian violated § 1681e(b) and that violation was both negligent and willful. (Compl. ¶¶ 31, 33.)

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Taylor v. Tenant Tracker, Inc*., 710 F.3d 824, 827 (8th Cir. 2013). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once a motion for summary judgment is properly made and supported, the nonmoving party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence

on which the jury could reasonably find for the plaintiff." *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

## ARGUMENT

To prevail on her claim under § 1681e(b), Plaintiff must establish four elements. First, that "Experian failed to follow reasonable procedures to assure the maximum possible accuracy of" the information it reported about Plaintiff. *Paul v. Experian Info. Sols., Inc*., 793 F. Supp. 2d 1098, 1101 (D. Minn. 2011) (Doty, J.). Second, that Experian "reported inaccurate credit information about her." *Id.* Third, that "she suffered harm." *Id.* And fourth, that "Experian's failure to follow reasonable procedures" caused that harm. *Id.*

## I.   EXPERIAN'S PROCEDURES ARE REASONABLE.

The FCRA is not a strict liability statute, and the mere presence of inaccurate information is insufficient to prevail on a § 1681e(b) claim. *Hauser v. Equifax, Inc.*, 602 F.2d 811, 814–15 (8th Cir. 1979). Instead, Plaintiff must show any "inaccuracy resulted from a negligent or willful failure to use reasonable procedures when the report was prepared." *Sepulvado v. CSC Credit Servs., Inc*., 158 F.3d 890, 896 (5th Cir. 1998). Experian is not liable for any inaccuracies so long as it maintains "reasonable procedures." *Hauser*, 602 F.2d at 814–15. When "the reasonableness of the procedure is beyond question, summary judgment is appropriate." *Ruffin-Thompkins v. Experian Info. Sys., Inc*., No. 03 C 683, 2003 WL 25719228, at *3 (N.D. Ill. Dec. 31, 2003), *aff'd sub nom.*

*Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603 (7th Cir. 2005); *accord Crabill v. Trans Union L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001); *Olwell v. Med. Info. Bureau*, No. CIV. 01-1481 JRTFLN, 2003 WL 79035, at *3 (D. Minn. Jan. 7, 2003); *see also Losch v. Experian Info. Sols., Inc.*, No. CV218809FTMPAMMRM, 2020 WL 728606, at *2–3 (M.D. Fla. Feb. 12, 2020) (Magnuson, J., sitting by designation).

### A.    Section 1681e(b)'s Reasonable Procedures Requirement Does Not Require Experian to Determine the Legal Status of a Particular Debt, Including If the Specific Debt is Discharged in Bankruptcy.

Courts have repeatedly held that it is reasonable as a matter of law for CRAs, such as Experian, to report the information they receive from presumptively reliable sources, like financial institutions, until they receive notice from the consumer that the source of that information is unreliable.  *E.g., Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004) (finding it reasonable as a matter of law for CRAs to report the information obtained from financial institutions "unless there was prior notice from the consumer that the information might be inaccurate"); *Henson*, 29 F.3d at 284–85 (rejecting a requirement that CRAs "engage in background research which would substantially increase the cost of their services" absent prior notice the source is unreliable); *see also Paul*, 793 F. Supp. 2d at 1101 (verification of information with furnisher was reasonable procedure as a matter of law).  Moreover, courts have repeatedly held that § 1681e(b) does not impose a duty to determine the specific legal effects of a consumer's bankruptcy on a debt.  *E.g., Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1241 (10th Cir. 2015); *Childress v. Experian Info. Sols., Inc.*, 790 F.3d 745, 747–48 (7th Cir. 2015); *Hupfauer v. Citibank, N.A.*, No. 16 C 475, 2016 WL 4506798, at *7 (N.D. Ill. Aug. 19, 2016) (remarking that "requiring a

third party such as a credit bureau to determine whether a specific account was discharged in a particular consumer's . . . bankruptcy would impose an unfairly heavy burden on that party"); *Cristobal v. Equifax, Inc*., No. 16-CV-06329-JST, 2017 WL 1489274, at \*3 n.4 (N.D. Cal. Apr. 26, 2017) ("The law does not require the CRAs to act as a tribunal or scour a bankruptcy file and make judgments about which debts are included." (internal quotation marks and citations omitted)).

That conclusion has been echoed by the Federal Trade Commission in regulatory guidance it provided about the FCRA.   In those regulations, the FTC has stated, unequivocally, that 15 U.S.C. § 1681e(b):

> [D]oes not require error free consumer reports.  If a consumer reporting agency accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face, the agency does not violate this section simply by reporting an item of information that turns out to be inaccurate.

16 C.F.R. pt. 600 app'x § 607(b)(3)(A); *see also id.* pt. 600 app'x § 607(b)(3)(D).

Against that backdrop, Plaintiff does not allege, let alone offer any evidence to show, that SFCU is not a reputable and reliable source of consumer credit information, or that its reporting was not credible on its face.  Nor could she, as she takes no issue with the other account SFCU was reporting.

Plaintiff's August 30, 2019, consumer disclosure shows that Plaintiff had multiple unsecured credit lines with SFCU, including the \*3776 account and SFCU Account No. \*2699 (the "\*2699 account").   On that disclosure, Experian was reporting the \*2699 account (which is not at issue here) as follows:

| SOUTHPOINT FEDERAL CR UN Partial Acct # ▮▮▮▮▮ 920 MAIN ST E SLEEPY EYE MN 56085 (507) 794 6712 | | | |
|---|---|---|---|
| Date opened<br>Jun 2017<br>Address ID #<br>0391898258<br>Type<br>Line of Credit | First reported<br>Individual<br>First reported<br>Jun 2017<br>Terms<br>Not reported<br>Recent payment<br>$50 | Monthly payment<br>$50<br>Credit limit or original amount<br>$500<br>High balance<br>$500 | Recent balance<br>$321 as of Jul 2019<br>Status<br>Open/Never late.<br>Date of Status<br>Jul 2019 |

Account History ▾ (AB = Account Balance, DPR = Date Payment Received, SPA = Scheduled Payment Amount, AAP = Actual Amount Paid)

|  | Jun19 | May19 | Apr19 | Mar19 | Feb19 | Jan19 | Dec18 | Nov18 | Oct18 | Sep18 | Aug18 | Jul18 | Jun18 | May18 | Apr18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AB ($) | 367 | 412 | 457 | 500 | 500 | 400 | 500 | 306 | 500 | 0 | 402 | 150 | 50 | 0 | 0 |
| DPR | Jun22 | May24 | Apr25 | Mar20 | Feb15 | Jan22 | Dec30 | Nov29 | Oct29 | Sep27 | Aug27 | Jul25 | Jun21 | May11 | Dec15 |
| SPA ($) | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | ND | ND |
| AAP ($) | 50 | 50 | 50 | 450 | 150 | 450 | 650 | 200 | 200 | 604 | 350 | 401 | 150 | 300 | ND |

|  | Mar18 | Feb18 | Jan18 | Dec17 | Nov17 | Oct17 | Sep17 | Aug17 |
|---|---|---|---|---|---|---|---|---|
| AB ($) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DPR | Dec15 | Dec15 | Dec15 | Dec15 | Oct10 | Oct10 | ND | ND |
| SPA ($) | ND | ND | ND | ND | ND | ND | ND | ND |
| AAP ($) | ND | ND | ND | 100 | 100 | 100 | ND | ND |

Between Aug 2017 and Jun 2019, your credit limit/high balance was $500

(*See* Hall Decl. Ex. F, Plaintiff's August 30, 2019, Disclosure, at 8).  Despite the fact that this account also predates her bankruptcy, Plaintiff does not allege that Experian was reporting that account inaccurately.  (*See* Compl. ¶ 14–15.)

Relevant here, Experian accurately reported the information provided by SFCU concerning the *3776 account.  That information was credible on its face, particularly in light of SFCU's reporting of the *2699 account.  SFCU's reporting specified that both accounts were "open" following Plaintiff's bankruptcy.  That reporting also indicated that Plaintiff was current on the *3776 account through April 30, 2019 (more than a month after she initially filed for bankruptcy), (Cave Decl. ¶ 23), and that she continued to make payments on the *2699 account both during and after her bankruptcy discharge.  (Hall Decl. Ex. F, Plaintiff's August 30, 2019, Disclosure, at 3–4, 8; Hall Decl. Ex. J, Plaintiff's March 25, 2020, Disclosure, at 3.)

Moreover, Experian received no notice that its reporting of the *3776 account was inaccurate.  Indeed, prior to Plaintiff's commencement of this litigation, neither Plaintiff,

nor SFCU, ever notified Experian that the *3776 account was included and discharged in Plaintiff's Chapter 7 bankruptcy. (Cave Decl. ¶¶ 28–29.) Absent such notice, it was entirely reasonable for Experian to report the account using the information provided to it by SFCU, who had actual knowledge of the *3776 account's status. Moreover, had Plaintiff bothered to notify Experian (prior to its automatic update of the *3776 account) that the SFCU debt was included or discharged in her Chapter 7 bankruptcy, Experian would have updated its reporting to reflect the debt's inclusion in the bankruptcy. (*Id.* ¶ 29.) No further action on the part of Plaintiff would have been required. (*Id.*)

In the end, Congress did not intend § 1681e(b) to result in perfectly accurate consumer reports. Instead, Congress enacted § 1681i to allow consumers to bring discreet errors in their reports to a CRA's attention. Had Plaintiff simply submitted a dispute, as she had said she would, this case would never have arisen. (Hall Decl. Ex. I, Hoglund Authorization Form, at 1; Cave Decl. ¶ 29.) Given the relevant judicial and regulatory guidance, Experian is entitled to summary judgment in its favor on that basis alone.

**B.    Experian Complied with the Binding *White* Order.**

As discussed, § 1681e(b)'s reasonable procedures requirement does not require Experian to determine the legal status of a particular debt, including if the specific debt is discharged in bankruptcy. *See supra* at 18-21. Indeed, only one court has even issued an order detailing when Experian should make some initial assumptions that a debt has been discharged in a consumer's Chapter 7 bankruptcy based on "statistic[s]": the *White* Court. (Hall Decl. Ex. B, *White* Order, at ¶ 5.1.)

As previously explained, the *White* Order generally requires Experian to assume that derogatory pre-petition debts are discharged in bankruptcy while at the same time requiring Experian to "undertake to exclude" accounts that were current at the time of the bankruptcy filing, like Plaintiff's *3776 account, from that assumption.  (Hall Decl. Ex. B, *White* Order, at ¶¶ 3.2(b)(ii)(E); 3.2(c)(ii)(E).)  That distinction was based on "the statistical likelihood" that derogatory accounts are discharged, whereas current accounts are ones the debtor intends to reaffirm, continue to use, or are subject to some agreement between the creditor and debtor such that reporting them as discharged could be misleading.  (*See id*. ¶ 5.1.)  The division between derogatory accounts and current accounts favors the consumer because it allows potentially positive accounts, like the *3776 and *2699 accounts, to continue to have beneficial effects on a consumer's creditworthiness while ensuring that derogatory prepetition debts have been updated to report as discharged in bankruptcy with no balance.

That distinction is particular important where, as here, Plaintiff continued to make payments on multiple unsecured debts, including the *2699 account and an account from SYNCB/Sam's Club (the "*3308 account"), during the pendency of her bankruptcy and after her bankruptcy discharge.

SYNCB/SAMS CLUB Partial Acct # ▇▇▇▇    PO BOX 965005 ORLANDO FL 32896 (800) 964 1917

| Date opened | Responsibility | Monthly payment | Recent balance |
|---|---|---|---|
| Jul 2010 | Authorized user | $101 | $3,309 as of Aug 2019 |
| Address ID # | First reported | Credit limit or original amount | Status |
| 0391898258 | Jul 2010 | $2,800 | Open/Never late. |
| Type | Terms | High balance | Date of Status |
| Charge Card | Not reported | $3,346 | Aug 2019 |
| | Recent payment | | |
| | $600 | | |

**Account History** * (AB = Account Balance, DPR = Date Payment Received, SPA = Scheduled Payment Amount, AAP = Actual Amount Paid)

| | Jul19 | Jun19 | May19 | Apr19 | Mar19 | Feb19 | Jan19 | Dec18 | Nov18 | Oct18 | Sep18 | Aug18 | Jul18 | Jun18 | May18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AB ($) | 2,692 | 2,701 | 1,918 | 950 | 340 | 274 | 0 | 268 | 2,467 | 2,598 | 1,946 | 2,192 | 2,053 | 2,565 | 2,205 |
| DPR | Jul17 | Jun18 | May01 | Apr14 | Feb24 | Jan15 | Jan15 | Dec09 | Nov14 | Oct07 | Sep07 | Aug12 | Jul20 | Jun27 | May08 |
| SPA ($) | 91 | 83 | 47 | 27 | 27 | 27 | 27 | 27 | 80 | 73 | 62 | 69 | 73 | 74 | 71 |
| AAP ($) | 700 | 900 | 500 | 895 | 100 | ND | 268 | 3,041 | 387 | ND | 287 | 326 | 1,232 | 71 | 253 |

| | Apr18 | Mar18 | Feb18 | Jan18 | Dec17 | Nov17 | Oct17 | Sep17 | Aug17 |
|---|---|---|---|---|---|---|---|---|---|
| AB ($) | 2,197 | 2,214 | 2,576 | 2,515 | 2,166 | 2,916 | 2,771 | 2,664 | 1,942 |
| DPR | Apr04 | Mar15 | Jan28 | Dec12 | Dec12 | Nov15 | Sep27 | Aug20 | Aug20 |
| SPA ($) | 67 | 74 | 73 | 113 | 74 | 69 | 80 | 114 | 101 |
| AAP ($) | 397 | 678 | 285 | ND | 1,086 | 561 | 386 | ND | 252 |

*Between Aug 2017 and Jul 2019, your credit limit/high balance was $2,800*

(*See* Hall Decl. Ex. F, Plaintiff's August 30, 2019, Disclosure, at 10).[5]

Perhaps most striking about Plaintiff's claim is that the assumptions she believes Experian should have made would have undoubtedly *harmed* her creditworthiness. (*See* Cave Decl. ¶ 15.) However, by reporting the *2699, *3308, and—relevant here—*3776 accounts in the manner it did, Experian sought maximum possible accuracy, while ensuring that Plaintiff's creditworthiness could benefit from making continued payments on debts

---

[5] Despite that reasonable distinction, Plaintiff asserts that § 1681e(b) requires Experian to assume that all unsecured, pre-petition bankruptcy debts, including the *3776, *2699, and *3308 accounts are discharged in a Chapter 7 bankruptcy. Plaintiff claims to rely on a "default legal rule" and "consensus standard" that all unsecured debts are discharged in a no-asset Chapter 7 bankruptcy to support that theory. (*See, e.g.,* Hall Decl. Ex. L, Deposition of Evan Hendricks, at 18:14–19:13, 22:15–23:18, 43:9–44:10, 107:12–108:11, 150:2–151:24.)

In fact, there is no such rule or standard. While bankruptcy courts have recognized that unsecured debts are discharged in a no-asset bankruptcy even if the debtor fails to list them on their bankruptcy schedule, *see In re Baskowitz*, 194 B.R. 839, 844 (Bankr. E.D. Mo. 1996), that does not obviate the numerous statutory exceptions to discharge that set forth in 11 U.S.C. § 523. And, as noted in Plaintiff's own discharge order, it certainly does not mean that all pre-bankruptcy debts are discharged, as Plaintiff's own expert concedes. (*See* Hall Decl. Ex. E, Plaintiff's Discharge Order, at 2; Hall Decl. Ex. L, Deposition of Evan Hendricks, at 27:14–22.)

that may not have been discharged in her bankruptcy or that she may have informally reaffirmed.  That reporting also ensured that Experian complied with the binding *White* order, which required Experian to report those accounts in the manner it did, absent notice to the contrary.[6]  (Hall Decl. Ex. B, *White* Order, at ¶¶ 3.2(b)(ii)(E); 3.2(c)(ii)(E).)

Crucially, the *White* Order does not absolve the CRAs of their reinvestigation duties.  (*Id*. ¶ 3.7.)  Like Congress, the *White* Court recognized that the procedures outlined therein would not result in perfect accuracy for every consumer who files a Chapter 7 bankruptcy.  (*See id.* ¶¶ 3.7, 3.8.)  Consequently, that Order invokes the very same remedy that is at the "heart" of Congress's efforts to ensure accurate consumer reports: the consumer dispute process.  (*Id*.)  For the unusual consumer, like Plaintiff, who would rather replace beneficial reporting with derogatory reporting ("discharged in bankruptcy"), the *White* Order provides a clear remedy: simply contact the relevant CRA to dispute the account.  (*Id*.)  If that dispute does not resolve the matter, the consumer is free to allege a violation of § 1681i.  (*See id*.)

Despite expressly acknowledging that she would submit a dispute prior to filing for bankruptcy, Plaintiff (or her attorneys) chose not to engage in the dispute process outlined

---

[6] The *White* Order is binding on Experian.  Were Experian to deviate from its provisions, such as by scrubbing a consumer's credit file to report that a "Current" account was discharged in Chapter 7 bankruptcy without some notice from the furnisher or consumer that it was, in fact, included in bankruptcy, Experian could subject itself to a possible enforcement action in the *White* matter, which remains ongoing.  It could also expose itself to potential liability in litigation alleging that Experian's failure to abide by the express terms of the *White* Order violated its obligations under Section 1681e(b).  That would put Experian in an impossible spot: unable to escape liability whether it complies with or deviates from the terms of the *White* Order.

in § 1681i.  (Hall Decl. Ex. I, Hoglund Authorization Form, at 1; *see also* Hall Decl. Ex. A, Deposition of Christa Peterson, at 63:20–23, 69:23–71:10, 79:13–80:8, 148:3–9.)  Thus, she can hardly be heard to complain that *White* was wrongly decided under these circumstances.

Importantly, the *White* Order provides, unequivocally, that the procedures set forth therein "are reasonable procedures to assure the maximum possible accuracy of Defendants' reporting of credit information regarding Consumers who have received a discharge pursuant to Chapter 7 of the United States Bankruptcy Code."  (Hall Decl. Ex. B, *White* Order, at ¶ 5.4.)  The Order further states that those "reporting procedures . . . are conclusively deemed to comply with the FCRA, including but not limited to Section 1681e(b) of that Act."  (*Id.*)  Indeed, Plaintiff offers no evidence to the contrary.  *Childress*, 790 F.3d at 747 (emphasizing that it is "the plaintiff's burden to establish the reasonableness of her proposed procedure.").

### C.    Experian's Reasonable Procedures Exceed the Requirements of the *White* Order and They Worked Perfectly in this Case.

Far from demonstrating that there is any problem with Experian's implementation of the *White* Order, this case actually demonstrates the contrary. As explained, and based on the requirements of the *White* Order, Experian employs an "initial" bankruptcy scrub that expressly incorporates that Order's mandated assumptions, including that Experian exclude "current" accounts from its automatic bankruptcy scrub.  (*See* Cave Decl. ¶ 13–17; Hall Decl. Ex. C, Cave Expert Report, at 11–17; *see also* Hall Decl. Ex. B, *White* Order, at ¶ 3.2.)

In this case, Experian ran its initial "scrub" on Plaintiff's credit file on July 2, 2019. (Cave Decl. ¶ 13–17.)  As a result, 15 of 16 accounts, which were seriously delinquent, were updated to report as included or discharged in Plaintiff's bankruptcy.  The *3776 account was not updated because it was only reporting as thirty days late when the scrub ran.  (*See* Cave Decl. ¶ 26; Hall Decl. Ex. C, Cave Expert Report, at 16.)  Standing alone, that procedure accords with the requirements of § 1681e(b), (Hall Decl. Ex. B, *White* Order, at ¶ 5.4), and it reflects the reality that consumers commonly maintain and continue paying certain debts during and after their bankruptcy, as Plaintiff did here on the *2699 and *3308 accounts.  (Hall Decl. Ex. G, *White* Memorandum in Support of Settlement, at 9–10; Hall Decl. Ex. C, Cave Expert Report, at 19; Hall Decl. Ex. F, Plaintiff's August 30, 2019, Disclosure, at 8, 10; Hall Decl. Ex. J, Plaintiff's March 25, 2020, Disclosure, at 3, 8.)  It also reflects the fact that consumers benefit from having open accounts with positive payment history on their credit reports and that the derogatory account status "discharged in bankruptcy" is generally more harmful to consumers than 30, 60, and 90-day delinquencies.  (*See* Cave Decl. ¶ 15.)

But Experian did not stop there.  Although not required to do so, Experian continued to automatically monitor the individual accounts in Plaintiff's credit file via a series of "look-back" scrubs.  (*See id.* ¶¶ 16–17.)  Once SFCU reported that the *3776 account was more than ninety days late, Experian's look-back scrub updated it to report as discharged in bankruptcy with no balance on October 7, 2019.  (*Id.* ¶ 27.)  That update occurred automatically, despite Experian's having never received noticed from either SFCU or Plaintiff that the account was included in Plaintiff's bankruptcy.  (*Id.* ¶¶ 27–29.)

The look-back scrub helps ensure "that the goal of the [*White*] Order"—"reporting derogatory pre-bankruptcy debts as discharged"—"is realized." (Hall Decl. Ex. C, Cave Expert Report, at 18.) It also forms an integral part of Experian's robust set of procedures for reporting debts included in a Chapter 7 bankruptcy. (*See* Cave Decl. ¶¶ 7–17; Hall Decl. Ex. C, Cave Expert Report, at 15–20.)

At bottom, Plaintiff's complaint with Experian's procedures is simply that Experian did not act fast enough to distinguish the *3776 account from the other positive accounts in Plaintiff's file. That complaint is exactly the sort of strict liability that the FCRA does not impose on CRAs like Experian. *See Hauser*, 602 F.2d at 814; (*see also* Hall Decl. Ex. L, Deposition of Evan Hendricks, at 125:20–126:3). This is especially true here, where Experian's measured approach is supported by a well-informed Order from the *White* Court, and it never received any actual notice from Plaintiff or SFCU that the *3776 account was discharged. (Cave Decl. ¶¶ 28–29.) Plaintiff's claim therefore fails as a matter of law and should be dismissed.

## II.   PLAINTIFF CANNOT SHOW ANY ACTUAL DAMAGES.

As with all negligence claims, Plaintiff's claims under 15 U.S.C. § 1681o require her to prove that Experian caused her actual damage. "It is well established that a plaintiff suing under the FCRA shoulders the burden of demonstrating the existence of damages resulting from an alleged FCRA violation; and, thus, the failure of an FCRA plaintiff 'to produce evidence of damage resulting from a FCRA violation mandates summary judgment.'" *Rambarran v. Bank of Am., N.A.*, 609 F. Supp. 2d 1253, 1262–63 (S.D. Fla.

2009) (quoting *Nagle v. Experian Info. Sols., Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002)). Plaintiff's claim fails at this juncture for at least three reasons.

*First*, there is no evidence that Plaintiff was denied credit based on Experian's reporting of the SFCU Account.  Plaintiff has not produced any denial letters or other similar evidence showing credit denials based on Experian's reporting.  Instead, Plaintiff offers only her own conclusory statements.  (Hall Decl. Ex. A, Deposition of Christa Peterson, at 13:2–17:12, 132:20–135:8.)  Such hearsay testimony is plainly insufficient to support Plaintiff's burden at this stage of the proceedings. *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) (highlighting that "inadmissible hearsay evidence cannot be used to defeat summary judgment"); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

*Second*, even if such testimony was sufficient, however, Plaintiff expressly *admitted* that she was denied credit because of her recent bankruptcy.  (Hall Decl. Ex. A, Deposition of Christa Peterson, at 13:2–12, 15:22–16:2, 16:11–17:12, 132:25–133:22.)   Although specifically asked, Plaintiff did not claim that she was denied credit based on Experian's reporting.  (*Id.*)  Plaintiff's admission is supported by the record, which is entirely devoid of evidence showing that any credit denial or adverse action that occurred after Plaintiff's bankruptcy discharge was based on Experian's reporting of the SFCU account, as opposed to the bankruptcy itself.   That lack of evidence is telling, given that bankruptcies themselves cause significant damage to a consumer's creditworthiness.  *See*, *e.g.*, *Jaras v. Equifax Inc.*, 766 F. App'x 492, 494 (9th Cir. 2019) ("Plaintiffs here do not make any allegations about how the alleged misstatements in their credit reports would affect any

transaction they tried to enter or plan to try to enter—and it is not obvious that they would, given that Plaintiffs' bankruptcies themselves cause them to have lower credit scores with or without the alleged misstatements."); Lucy Lazarony, *What Happens to Your Credit Score After Bankruptcy?*, CREDIT.COM (Mar. 10, 2020), http://www.credit.com/credit-scores/3-things-bankruptcy-does-to-your-credit-score/ ("After bankruptcy, your credit score can plummet. . . . Bankruptcy will have a devastating impact on your credit health."); Consumer Fin. Prot. Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System 12 (Dec. 2012), http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf (showing bankruptcy filing as causing greatest harm to credit score).

*Third*, with respect to Plaintiff's emotional distress claim, Plaintiff has expressly admitted that she has not met with, or been examined by, any medical doctors, psychologists, psychiatrists, spiritual advisors, or mental health professionals, as a result of Experian's credit reporting. (Hall Decl. Ex. K, Plaintiff's Responses to Experian's Requests for Admission, at 4-5). Plaintiff also admits that she has not incurred any expenses in connection with medical, spiritual or counseling treatment as a result of Experian's credit reporting. (*Id.*) In addition, Plaintiff's claim of emotional distress is supported only by her own conclusory testimony.

Courts routinely hold that conclusory testimony of emotional distress is not sufficient at summary judgment. *See*, *e.g.*, *Taylor*, 710 F.3d at 827–29 (affirming summary judgment and holding that a consumer who "suffered no physical injury," "was not medically treated for any psychological or emotional injury," and "offered no reasonable detail about the nature and extent of her alleged emotional distress" failed to "establish the

sort of concrete emotional distress that is required to constitute a genuine injury and actual damages."); *Ruffin-Thompkins*, 422 F.3d at 610–11 (finding that a plaintiff failed to demonstrate actual damages because she merely "provided, at most, conclusory statements about her emotional distress"); *Cousin v. Trans Union Corp.*, 246 F.3d 359, 371 (5th Cir. 2001) (concluding that a plaintiff's testimony that seeing his inaccurate credit report made him "[v]ery upset" and "angry" was insufficient to establish a genuine injury); *Sarver*, 390 F.3d at 971 ("We have maintained a strict standard for a finding of emotional damage 'because they are so easy to manufacture.'" (citation omitted)).

Courts in this district also routinely grant summary judgment in cases like this one where the only evidence of emotional distress is the plaintiff's own conclusory testimony. *See*, *e.g.*, *Dao v. Cellco P'ship*, No. 14-1219 (JRT/BRT), 2015 WL 7572304, at *5 (D. Minn. Nov. 24, 2015) (concluding that the plaintiff's "conclusory claims of emotional distress—based solely on his own testimony—do not show a concrete and genuine emotional injury and do not give rise to a genuine factual dispute necessitating trial"); *Edeh v. Equifax Info. Servs., LLC*, 974 F. Supp. 2d 1220, 1244 (D. Minn. 2013), *aff'd*, 564 F. App'x 878 (8th Cir. 2014) (granting summary judgment where there was "no evidence that [the plaintiff] suffered any physical injury related to his emotional distress or that he was treated for his emotional distress"); *Reed v. Experian Info. Sols., Inc.*, 321 F. Supp. 2d 1109, 1115–16 (D. Minn. 2004) (Doty, J.) (holding that the plaintiff's evidence, which "consist[ed] of his vague testimony that 'it's not a good feeling,' that he is 'emotional' and 'pissed about the whole thing'" was inadequate to support a claim of emotional distress).

That extensive authority strongly supports Experian's claim that it is entitled to summary judgment in this case. Because Plaintiff fails to present sufficient evidence in support of the damages element of her claim, the court should grant Experian's Motion for Summary Judgment.

## III.  PLAINTIFF CANNOT DEMONSTRATE THAT EXPERIAN'S ALLEGED VIOLATIONS OF THE FCRA WERE WILLFUL.

At a minimum, Experian is entitled to summary judgment on Plaintiff's claim that Experian's alleged violations were willful. To establish that Experian willfully failed to comply with § 1681e(b), Plaintiff is required to demonstrate that Experian either knowingly or recklessly violated that provision. *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017). Such a showing requires Plaintiff to demonstrate that Experian's action was "not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69. Importantly, there is no willful violation where a CRA "followed an interpretation that could reasonably have found support in the courts[.]" *Id.* at 70 n.20. "Whether a defendant's reading of the FCRA is unreasonable is an objective question that must be decided as a matter of law, without regard to 'whatever [the defendant's] subjective intent may have been.'" *Harris v. Experian Info. Sols., Inc.*, No. 6:06-CV-1808-GRA, 2009 WL 10693883, at *8 (D.S.C. June 30, 2009) (quoting *Safeco*, 551 U.S. at 70 n.20).

As explained above, courts have repeatedly recognized that reliance on financial institutions like SFCU is reasonable under § 1681e(b). *See, e.g.*, *Sarver*, 390 F.3d at 972;

*Henson*, 29 F.3d at 284–85.  Indeed, even the FTC has taken that approach.  16 C.F.R. pt. 600 app'x § 607(b)(3)(A), (D).

Moreover, Experian's reporting here was directed by the *White* Order, which states that the procedures Experian employed here comply with § 1681e(b).  (Hall Decl. Ex. B, *White* Order, at ¶ 5.4).  Those procedures were developed after extensive litigation and carefully designed to increase the accuracy of post-bankruptcy credit reporting while minimizing harm to consumers.  The *White* Order's interpretation of the FCRA is not "objectively unreasonable," and Experian's adherence to its terms—including by not updating current accounts to report as discharged in bankruptcy—represents an interpretation that *has* found support in the courts.[7]  *Safeco*, 551 U.S. at 70 n.20.

In short, because Experian's procedures are directly in line with the plain language of the FCRA and applicable case law, any claim that Experian's supposed violations were willful fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Experian respectfully requests the Court grant Experian's Motion for Summary Judgment and dismiss Plaintiff's claims with prejudice.

---

[7] In fact, Experian went beyond the requirements of the *White* Order by continuing to monitor the *3776 account, and automatically updated it to report as discharged in bankruptcy with no balance, despite having never received notice of the debt's inclusion in bankruptcy.  (Cave Decl. ¶¶ 27–29.)

Dated:  April 26, 2021.                    Respectfully submitted,

                                           */s/ Christopher A. Hall*
                                           Christopher A. Hall, IL #6316715
                                           (admitted *Pro Hac Vice*)
                                           JONES DAY
                                           77 West Wacker Drive
                                           Chicago, IL 60601-1692
                                           Telephone: (312) 782-3939
                                           Email: chall@jonesday.com

                                           Christopher M. Johnson, MI #P82861
                                           (admitted *Pro Hac Vice*)
                                           JONES DAY
                                           4655 Executive Drive, Suite 1500
                                           San Diego, California 92121-3134
                                           Telephone:  (858) 314-1185
                                           Email: cjohnson@jonesday.com

                                           Gregory J. Myers, MN #0287398
                                           LOCKRIDGE GRINDAL NAUEN
                                           P.L.L.P.
                                           100 Washington Avenue South, Suite 2200
                                           Minneapolis, MN 55401
                                           Telephone: (612) 339-6900
                                           Facsimile: (612) 339-0981
                                           Email: gjmyers@locklaw.com

                                           *Counsel for Defendant Experian*
                                           *Information Solutions, Inc.*