## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CHRISTA PETERSON,<br><br>     Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC.; EQUIFAX<br>INFORMATION SERVICES,<br><br>     Defendants. | **Case No.: 0:20-cv-00606-DSD-ECW**<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Christa Peterson ("Plaintiff"), through undersigned counsel, hereby submits her Memorandum in Opposition to Defendant Experian Information Solutions, Inc.'s ("Defendant" or "Experian") Motion for Summary Judgment.

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................ 1

II. STATEMENT OF FACTS ......................................................................... 3

III. LEGAL STANDARD ................................................................................ 4

   1.  MOTION FOR SUMMARY JUDGMENT STANDARD ................................. 4

   2.  THE FAIR CREDIT REPORTING ACT ............................................ 5

IV. ARGUMENT ............................................................................................ 7

   1.  EXPERIAN VIOLATED THE FCRA BY FAILING TO EMPLOY
      REASONABLE PROCEDURES TO ASSURE MAXIMUM ACCURACY ..... 7

     A.  Experian Cannot, In Good Faith, Feign Ignorance Of Plaintiff's Bankruptcy
        Discharge and Its Effect On The Account ...................................... 9

     B.  Experian Continues To Exhibit An Incorrect and Tortured View Of The
        *White* Order's Pertinence ................................................. 11

     C.  Experian's Newly Implemented Post-Bankruptcy Procedures Would Have
        Correctly Reported The SFCU Account As Discharged At The Time Of The
        Initial Scrub ............................................................. 14

     D.  Plaintiff Had No Obligation To Personally Notify Defendant Of Her
        Account's Discharged Status ............................................... 17

   2.  EXPERIAN'S INACCURATE REPORTING DAMGED PLAINTIFF ........... 21

     A.  Experian's Inaccurate Reporting Caused Actual Damages by Damaging
        Plaintiff's Creditworthiness ............................................... 21

     B.  Plaintiff Suffered Further Actual Damages As A Result of Experian's FCRA
        Violation ................................................................. 25

   3.  GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER
      EXPERIAN'S FCRA VIOLATIONS WERE WILLLFUL PRECLUDE
      SUMMARY JUDGMENT ............................................................. 32

V.  CONCLUSION ........................................................................................ 34

## I.    __INTRODUCTION__

Plaintiff commenced this action on February 26, 2020, alleging that Experian violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681e(b), by failing to maintain reasonable procedures to assure maximum possible accuracy of Plaintiff's reported consumer information in the credit report Experian provided to third parties. Complaint, Doc. 1. More specifically, Experian reported Plaintiff's Southpoint Federal Credit Union ("SFCU") account (the "Account") with an outstanding balance, a past due balance, and as past due for several months after the Account's related debt was discharged through Plaintiff's Chapter 7 bankruptcy. Experian did not report the Account with a zero balance when the debt was discharged, and did not report the Account as discharged until after it was reported 150 days delinquent. Experian's inaccurate reporting made it appear as though Plaintiff still remained both liable for, and severely delinquent on the Account, even though the Account was indisputably discharged on June 26, 2019.

Experian asks this Court to grant summary judgment, despite the admitted fact that the Account was reported inaccurately for over 5 months, because Experian allegedly followed "reasonable" procedures when updating Plaintiff's credit report after she received her Chapter 7 discharge in June 2019. (Doc. 89.) Experian knows these procedures were not reasonable, as evidenced by Experian's voluntary changes to its post-bankruptcy reporting procedures earlier this year following numerous consumer lawsuits.

Experian further knew that its unreasonable post-reporting procedures were not consistent with the procedures followed by the other national consumer reporting agencies, and admittedly made the recent procedural changes to (belatedly) align with the other national consumer reporting agencies' implementation of the settlement of a 2008 class action, *White, et al. v. Experian Info. Solutions, Inc.*, No. 8:05-cv-01070-DOC-MLG (C.D. Cal. 2008). Ex. A, *White* Settlement.

Experian cannot support its position with evidence in the record. Rather, Experian maintains the unavailing premise that its procedures are reasonable simply because they were purportedly authorized by the settlement of the 2008 *White* class action. This Court previously contemplated the implication of the *White* settlement and, as this Court and others have held many times prior, the *White* Order lacks any binding effect on the Court. *See* Doc. 79, Order Denying Experian's MJOP ("Judges within this district have already held that *White* is not binding on this court, and the court agrees with those decisions.").

Experian appears to have set aside this very Court's prior conclusions on the *White* settlement by continuing to rely on it throughout its Motion for Summary Judgment. Despite Experian's contention, the *White* settlement is not applicable to the facts of this case, or binding on this Court.  Further, *White* does **not** allow the continued reporting of an amount owed/outstanding balance for discharged debt as Experian suggests. *White* therefore does not (and could not) resolve genuine questions as to the reasonableness of Experian's procedures.

The established record in this case demonstrates undoubtedly that Experian failed to follow reasonable procedures to assure maximum possible accuracy of the information it reported on Plaintiff's consumer credit report. Experian independently procured Plaintiff's consumer bankruptcy filing and discharge information from Lexis Nexis, but admittedly did not update the Account, which Experian knew was an unsecured debt that was opened prior to the filing of Plaintiff's bankruptcy petition and discharged in bankruptcy.

Nevertheless, Experian asks the Court to weigh evidence in its favor and to make factual findings by determining the reasonableness of its procedures. In doing so, Experian makes a staggering number of unsupported conclusory statements disguised as statements of fact, as well as statements that bear neither weight nor relevance to the issues presented before the Court.

## II.  **STATEMENT OF FACTS**

On March 25, 2019, Plaintiff filed for voluntary bankruptcy under Chapter 7 of Title 11, the Bankruptcy Code, in the District of Minnesota (Minneapolis), case number 19-30865. (Ex. B, Bankruptcy Docket.) Plaintiff obtained a Chapter 7 discharge on June 26, 2019. *Id.*

On or about August 30, 2019, Plaintiff obtained her Experian consumer credit report. (Doc. 91-1, Experian Report.) Plaintiff discovered that Experian was reporting the Account with a recent balance of "$2,481 as of Jul 2019," a past due balance of $214, a Payment history indicating the Account was 30 days past due May 2019, 60 days past due as of June 2019, and 90 days past due as of July 2019. (*Id.* at p. 4-5.)

Experian was not reporting the Account with its true $0 balance, or as discharged in bankruptcy. *Id.* Experian continued to report the Account as past due and with a balance until at least October 7, 2019, at which point the Account was reporting 150 days delinquent. (Doc. 92, Cave Dec. ¶ 23.)[1]

The Account was listed in the Schedule F form of Plaintiff's Chapter 7 bankruptcy and discharged on June 26, 2019. (Doc. 90-6, p. 4; Ex. B, Bankruptcy Docket, p. 3.) Experian had actual knowledge of Plaintiff's bankruptcy filing and discharge, as evidenced by Experian's reporting of the date of filing, the date resolved, and the discharge status of Plaintiff's Chapter 7 bankruptcy on Plaintiff's August 30, 2019, credit report. (Doc. 91-1, p. 4-5.) Experian affirmatively reported other bankruptcy debts as "Discharged through Bankruptcy Chapter 7." (Doc. 91-1.)

As a result of Experian's reporting of inaccurate information on Plaintiff's credit report, Plaintiff has sustained actual damages, including but not limited to embarrassment, emotional and mental pain, stress, frustration, and anxiety.

### III.   **LEGAL STANDARD**

### 1.   **MOTION FOR SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only where "the pleadings, affidavits and discovery findings 'show that there is no genuine issue of material fact and that the moving party is entitled to relief as a matter of law.'" *Bernie v. United States*, 712 F.2d 1271, 1273 (8th Cir. 1983).

---

[1] The Account Balance also increased each month that it was reporting inaccurately, thereby increasing Plaintiff's Credit Utilization Rate. (Doc. 91-1, p. 4-5.)

"On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party." *Harris v. Interstate Brands Corp.*, 348 F.3d 761, 763 (8th Cir. 2003). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

### 2.    THE FAIR CREDIT REPORTING ACT

"The FCRA was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilizes accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010). The FCRA exists "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007).

Experian regularly assembles consumer credit information for the purpose of providing such information to third parties for monetary compensation and is therefore "consumer reporting agency" (CRA) as defined by the FCRA. 15 U.S.C. § 1681a(f).

The FCRA requires consumer reporting agencies, like Experian, to follow reasonable procedures to "**assure maximum possible accuracy**" when preparing consumer reports:

> *Accuracy of report*. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b). *See also, Paul v. Experian Info. Sols., Inc*., 793 F. Supp. 2d 1098, 1101 (D. Minn. 2011) (quoting 15 U.S.C. § 1681e(b)) ("A CRA must 'follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.'").

The FCRA expressly provides a private right of action against consumer reporting agencies that fail to comply with § 1681e(b). The FCRA imposes liability for willful violations, where actual or statutory damages, punitive damages, and reasonable attorney's fees and costs are available, *see* 15 U.S.C. § 1681n, as well as negligent violations, where actual damages and reasonable attorney's fees and costs are available. 15 U.S.C. § 1681o.

To maintain a claim under 15 U.S.C. § 1681e(b), Plaintiff must demonstrate that: (1) Experian failed to follow reasonable procedures intended to assure the accuracy of its reports, (2) Experian reported inaccurate credit information about Plaintiff, (3) Plaintiff suffered harm, and (4) that Experian's failure to follow reasonable procedures was the cause of Plaintiff's harm. *Paul*, 793 F. Supp. 2d at 1101 (citing *Gohman v. Equifax Info. Servs., LLC*, 395 F.Supp.2d 822, 826 (D. Minn. 2005); *Reed v. Experian Info. Solutions, Inc*., 321 F.Supp.2d 1109, 1113 (D. Minn. 2004).

**Once information in a consumer report is found to be inaccurate, the "question is what [the consumer reporting agency] did or did not do in preparing the report**." *Bryant v. TRW, Inc.*, 487 F. Supp. 1234, 1240 (E.D. Mich., 1980) (citing *Lowry v. Credit Bureau, Inc. of Georgia,* 444 F. Supp. 541 (N.D. Ga. 1978)).. "Preparation may be viewed as a continuing process and the obligation to insure accuracy

arises with every addition of information." *Id.*

Whether a consumer reporting agency followed "reasonable procedures" is typically a fact question reserved for the jury. *See Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir. 2001); *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir.1991). "[T]he reasonableness of a [CRA's] procedures is 'normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question.'" *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010) (quoting *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004)).

The FCRA is to be **liberally construed** in favor of the consumer. *Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961 (6th Cir. 1998); *see also Johnson v. ADP Screening & Selection Services, Inc.*, 768 F. Supp. 2d 979, 983 (D. Minn. 2011) ("The court construes remedial statutes such as the FCRA liberally to give effect to the intent of Congress."); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (("[C]onsumer oriented objectives support a **liberal construction** of the FCRA.")).

## IV.   <u>ARGUMENT</u>

### 1. EXPERIAN VIOLATED THE FCRA BY FAILING TO EMPLOY REASONABLE PROCEDURES TO ASSURE MAXIMUM ACCURACY

"The determination of the reasonableness of a defendant's procedures under the FCRA is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless the reasonable or unreasonableness of the procedures is **beyond question**." *Graham v. CSC Credit Servs.*,

306 F. Supp. 2d 873, 876 (D. Minn. 2004) (quoting *Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 664 (7th Cir. 2001)) (emphasis added). The inadequacies of Experian's post-bankruptcy reporting procedures are self-evident and are under no circumstance reasonable beyond question. In fact, the undisputed facts support a finding that Experian's procedures are **unreasonable beyond question**.

Notably, the post-bankruptcy procedures employed by Experian at the time Plaintiff's cause of action arose, allowed Experian to report pre-petition debts inaccurately after the debt has been discharged in bankruptcy. According to Experian's own witness, the "initial" bankruptcy scrub that Experian conducts within eight days after a consumer receives a bankruptcy discharge *excludes* accounts that are "current at the date of the bankruptcy filing unless those debts were more than ninety days delinquent when the scrub executed." (Doc. 92, Cave Decl. ¶ 14.) This initial exclusion in effect allowed Experian to bypass Plaintiff's SFCU account following Plaintiff's June 2019 discharge, even though Experian knew Plaintiff ceased paying this account after filing bankruptcy and did not resume paying the discharged account (as essentially all consumers do). That alone demonstrates Experian's failure to implement reasonable procedures. However, the "look-back" scrub that Experian conducts every other month to update accounts that may have been discharged but were not being reported as such further demonstrates the inadequacy of these procedures. (*Id.* ¶ 16.) The "look-back" scrub may appear on its face to be a reasonable attempt to combat inadequacies in Experian's initial "bankruptcy scrub." However, a more scrupulous review of Experian's "look-back" scrub reveals a glaring hole that can only be interpreted as an attempt by

Experian to evade its obligation to assure **maximum accuracy** at the expense of consumers.

Significantly, a discharged account, which is reporting as "current" at the time of the discharge, is not identified by Experian's "look-back" scrub until it is reported over ninety-one days late by the furnisher (who often cease reporting/updating altogether). In simple terms, Experian regularly provides itself a window of several months before finally reporting as discharged an account like the one at issue in the instant matter.[2] Further, many times, furnishers cease reporting after a bankruptcy is filed; in such instances, Experian's "look back" scrub will **never** catch an account that was less than 120 days late at the time of the bankruptcy filing—the account could continue to report inaccurately for seven-plus more years.

It is nonsensical for Experian to ask this Court to find such a deficient, consumer-harming procedure, as one that ensures maximal accuracy.

### A. Experian Cannot, In Good Faith, Feign Ignorance Of Plaintiff's Bankruptcy Discharge and Its Effect On The Account

Experian affirmatively procured Plaintiff's consumer bankruptcy information from its public records vendor, LexisNexis Risk Data Management Inc., including notice pertaining to the filing and discharge. (Doc. 92, Cave Decl. ¶ 11.) Experian voluntarily included Plaintiff's bankruptcy information in multiple sections of her credit report. Upon

---

[2] Because furnishers generally report delinquent accounts in increments of thirty days, Experian's "look-back" scrub does not identify as potentially inaccurate Accounts like the one at issue in this case until they report as either 120 or 150 days delinquent. In this case, Experian did not correct its reporting of the Account until after the Account reported as 150 days delinquent. (Doc. 92, Cave Decl. ¶ 23.)

receiving notice of Plaintiff's discharge, Experian was obligated to update Plaintiff's credit report to accurately reflect its effect. Experian is aware of the legal effect of a Discharge Order in a Chapter 7, no-asset bankruptcy.  This is not complex and does not require legal analysis (and is contradicted by admitted presumptions and procedures Experian follows). In fact, Experian's own Exhibit dispels any contention that Experian was unaware of the "Default Rule" that assumes all dischargeable debts are included in a Chapter 7 bankruptcy.

> Indeed, both Plaintiffs' and Defendants' **bankruptcy experts** generally agree that whether or not bankruptcy debtors list a debt in the bankruptcy petition, **if it is dischargeable by nature it will be discharged by virtue of a Chapter 7 no-asset discharge order unless the bankruptcy court orders otherwise.**

> Therefore, **absent any indication to the contrary** within a consumer's credit file as maintained by Defendants, **these identified debts are eligible under the Agreement for the Agreed Bankruptcy Coding**.

(Doc. 90-5, p. 15:5-13.)

There is nothing in the bankruptcy petition or docket that indicates Plaintiff remained liable for the Account beyond her discharge in June 2020. (Ex. B, Bankruptcy Docket; Doc. 90-6, Bankruptcy Petition.) The docket does not include any Motions to Stay, objections to dischargeability, adverse actions, or reaffirmation agreements. (Ex. B, Bankruptcy Docket.) If anything, Plaintiff's cessation of further payments on the Account when she filed bankruptcy (like the cessation of payment of other discharged accounts), confirms that the Account was indeed discharged. Therefore, Experian **should have presumed** the Account was discharged, consistent with its knowledge of the default effect of a discharge. Even if there was some doubt as to the post-bankruptcy status of the

Account, Experian had no reasonable basis for assuming the Account was **not discharged based on the information known by Experian**.

### B. Experian Continues To Exhibit An Incorrect and Tortured View Of The *White* Order's Pertinence

This Court denied Experian's Motion for Judgment on the Pleadings on January 25, 2021. (Doc. 79.) The Court agreed with the consensus opinion in this District, holding that the *White* Order is not binding on this Court. *Id.* at 6. Later, the Court denied Experian request for leave to file a motion to reconsider its ruling on the *White* Order. (Doc. 83.) Yet, Experian curiously takes another stab at arguing the pertinence of the *White* Order as it relates to this Court's determination of the reasonableness of Experian's reporting procedures. Littered throughout Experian's Motion for Summary Judgment are assertions that Experian's post-bankruptcy procedures meet the conditions set forth in the *White* Order. However, absent its tortured view of *White's* relevance to the instant case, Experian has presented no evidence demonstrating that its procedures are reasonable under the § 1681e(b) of the FCRA.

Notably, the limited instruction the *White* Order provides this Court supports a denial of Experian's Motion. Experian understands its procedures for reporting consumer bankruptcies often produce inaccurate or otherwise incomplete information in violation of the FCRA. *See Gibson v. Experian Info. Sols.*, No. 4:20-cv-00393-AGF, 2020 U.S. Dist. LEXIS 189258, at *7 (E.D. Mo. Oct. 13, 2020) (quoting *Morris v. Experian Info. Sols., Inc.*, 478 F. Supp. 3d 765, 769 (D. Minn. 2020)) ("[T]he *White* settlement makes clear that the CRAs knew that unsecured consumer debts . . . are typically discharged in

-11/36-

Chapter 7 proceedings. Moreover, the *White* settlement itself provides notice that not updating such accounts after a Chapter 7 bankruptcy may fail to comport with § 1681e(b).").

Experian further attempts to invent the presence of catch-22 situation, whereby it must choose to comply with either the *White* Order or the FCRA, but not both. The validity of this premise is shattered by the fact that Experian changed its post-bankruptcy procedures on two fronts in both January and March of this year, but nonetheless remained in compliance with the *White* Order.

Further, as noted in Plaintiff's opposition to Experian's Motion for Judgment on the Pleadings, which Plaintiff incorporates here, *White* pertains to the application of "Agreed Bankruptcy Coding" status terminology and does not permit Experian or any other consumer reporting agency to report an amount owed/outstanding **balance** for discharged debt. *See* Doc. 55. Thus, regardless of whether "Agreed Bankruptcy Coding" status terminology is applied, this is separate from Experian's remained duty to report accurate, post-discharge balances of **$0 for discharged debt**. There is no enforcement action or liability risk. By its plain terms, *White* does not pertain to scrubbing of report balances, which must be reported accurately as $0 for discharged debt; *White* instead pertains to scrubbing to apply "Agreed Bankruptcy Coding" status terminology.

For the sake of argument, even as to the propriety of whether to apply "Agreed Bankruptcy Coding" status terminology, Experian is also mistaken. Under *White*, "'**Current Status**'" means an account status or rating indicating that, as of the date of last reporting, there is no **outstanding**, overdue, and delinquent balance currently due.

Experian merely argues that Plaintiff's account was "current," and properly excluded from the automatic scrub. However, this interpretation would render the definition's use of "outstanding" superfluous, and directly conflict with both the reporting requirements described by FTC Code of Federal Regulations, as well as subsequent provisions of the *White* settlement that allows Experian to also exclude "**Closed Accounts**," **which by definition are $0 balance accounts that encompass "Current Status" accounts:**

> 2.6 "**Closed Account**" means that **an account is reporting with a zero balance** and has a narrative or other code indicating any of the following: (a) that the account has been closed by a consumer or creditor; (b) that the account has a **Current Status**; (c) that the account has been transferred, sold, lost or stolen; (d) or that the account is an installment loan that has been paid in full.

Ex. A, at p. 8, 2.6.

Therefore, to comply with the *White* settlement terms and applicable federal law, Experian was required to report the Account with either **Agreed Bankruptcy Coding,** or with a $0 account balance. Despite Experian's contentions otherwise, there is no rendition of the *White* settlement that could permit Experian to report amounts owed/outstanding balances for indisputably discharged debt, which would be consistent with federal law or regulations (much less the actual *White* settlement terms). Experian's rendition of "Current Status" directly conflicts with FTC Regulations, *see* 16 C.F.R. pt. 600 app'x § 607(b)(6), as well as Experian's Congressionally-mandated statutory duty to follow reasonable procedures to assure maximum possible accuracy. *See* 15 U.S.C. § 1681e(b) (since it is indisputably inaccurate to report discharged debt with a balance of anything other than $0). Experian's perpetual proclivity to rely on the *White* Order–

without success–illustrates the insecurity that Experian maintains in its procedures under the scrutiny of the FCRA. That lack of confidence is further evidenced by Experian's recently implemented changes to its post-bankruptcy procedures, discussed more fully below.

### C. Experian's Newly Implemented Post-Bankruptcy Procedures Would Have Correctly Reported The SFCU Account As Discharged At The Time Of The Initial Scrub

Having observed and known about the inadequacies in its previous procedures for many years now, Experian finally implemented new post-bankruptcy reporting procedures that went into effect in or around April 1, 2021. (Doc. 92, Cave Decl. ¶¶ 14, 16.) While Experian's decision to change its reporting procedures may not be interpreted by the Court as an admission of guilt, it is objectively reasonable to see it as a silent acknowledgment by Experian that its previous procedures (those in effect at the time of Plaintiff's discharge) did not assure maximum accuracy of the information it was reporting on consumers' credit reports. Maximum means "the greatest . . . amount possible, assignable, allowable, etc."  http://www.dictionary.com/browse/maximum. While Plaintiff contends even Experian's current/revised procedures do not assure maximum possible accuracy, they do assure *more* accuracy than the procedure in place at the time of Plaintiff's credit report. At the time Plaintiff's cause of action arose, Experian's "initial" bankruptcy scrub and bi-monthly "look-back" scrubs did not assure maximum accuracy.

On or about May 1, 2019, during the pendency of Plaintiff's bankruptcy, SFCU reported that the *3776 account was current as of April 30, 2019. On or around June 1, 2019, SFCU reported that the *3776 account was

thirty days late as of May 31, 2019. On or around July 4, 2019, SFCU reported that the *3776 account was sixty days late of June 30, 2019. On or around August 1, 2019, SFCU reported that the *3776 account was ninety days late as of July 31, 2019. On or around September 1, 2019 SFCU reported that the *3776 account was 120 days late as of August 30, 2019. On or around October 3, 2019, SFCU reported that the *3776 account was 150 days late as of September 30, 2019.

(Doc. 92, Cave Decl. ¶ 23.)

When Experian ran its "initial" scrub on Plaintiff's credit file on or around June 2, 2019, the *3776 account was only reporting as thirty days late. Because the *3776 account did not qualify under the scrub logic it was excluded from the scrub.

(Id. ¶ 26.)

Experian ran a look-back scrub on Plaintiff's credit file on or around August 5, 2019. At that time, the 3776* account was only reporting as ninety days late. Because the *3776 account did not qualify under the scrub logic it was again excluded from the scrub. Experian ran another look-back scrub on Plaintiff's credit file on or around October 7, 2019. At that time, the *3776 account was updated to report as discharged in bankruptcy with no balance because it was reporting as **150 days late**, and therefore qualified under the scrub logic.

(*Id.* ¶ 27.) (emphasis added)

Under Experian's bizarre premise, the above is supposedly a reasonable procedure that assures **maximum accuracy**, or in other words, the greatest possible accuracy (not 100% accuracy). However, the foregoing is in stark contrast to Experian's latest procedures as of April 1, 2021:

As of April 1, 2021, the initial scrub updates accounts that have an open date prior to the consumer's Chapter 7 bankruptcy petition, are not in a finalized status (such as paid) at the time the consumer's bankruptcy petition is filed, and are **thirty or more days delinquent** as of date the scrub executes.

(*Id.* ¶ 14.) (emphasis added)

> Prior to February 4, 2021, and at all times relevant to Plaintiff's claim, Experian conducted its "look back" bankruptcy scrub on the first Monday of **every other month** for an eighteen month period following the bankruptcy discharge. The look-back **now executes the first Monday of every month**. Similar to the initial bankruptcy scrub, and at all times relevant to Plaintiff's claim, the look-back scrub updated any pre-bankruptcy debt reporting as **more than ninety days delinquent**, regardless of its status at the time the bankruptcy was filed. . . As of April 1, 2021, the look-back scrub also updates any pre-bankruptcy debt reporting as **thirty or more days delinquent** at the time the scrub executes, regardless of its status at the time the bankruptcy was filed.

(*Id.* ¶ 16.) (emphasis added)

The question the Court must ask itself here, rhetorically, is, *if* Experian genuinely believes that it followed reasonable procedures to assure maximum accuracy–complying with its obligations under the FCRA–*why* did Experian recently make updates to its procedures for more stringent look-back periods and shorter delinquencies to address its failure to accurately report discharged debt?

Experian updated these procedures in response to a growing number of consumer complaints and because Experian not only knew these procedures failed to meet the industry standard, but were also **inconsistent** with how the other national consumer reporting agencies implemented the *White* settlement.[3]

---

[3]      When assessing the reasonableness of a consumer reporting] agency's procedures, the potential for harm caused by an inaccuracy can be weighed against the burden of safeguarding against such inaccuracy. *See, e.g.*, *Philbin v. Trans Union Corporation*, 101 F.3d 957, 963 (3d Cir. 1996). In this case, there was no burden to Experian to adopt procedures that comported with the industry standard or were at least consistent with the two other national consumer reporting agencies' procedures for implementing the *White* settlement. Experian concedes cost was not a factor in this instance (which is also evident by use of the "updated" procedures by the other national consumer reporting agencies from the outset). Ex. H, Stipulation. Since 2008, Experian has profited from these grossly inadequate

These changes were decisions made by Experian at the direction of its legal counsel in order to align with Experian's understanding of how other national consumer reporting agencies implemented the requirements of the White injunction.

Ex. C, Decl. K. Cave ¶ 7.

Plaintiff received her bankruptcy discharge on June 26, 2019. At the time of Experian's initial scrub on July 2, 2019, the Account was reporting as thirty days late. (*Id.* ¶ 26.) Subject to the procedures employed by Experian at the time of Plaintiff's bankruptcy discharge, the Account did not qualify under the scrub logic until October 7, 2019, at which point the Account was reported as being 150 days delinquent. Notably, under Experian's new scrub procedures as of April 1, 2021, the Account would have been reported as discharged in bankruptcy on July 2, 2019, only six days after the discharge. Had the furnisher ceased updating Plaintiff's Account when she filed for bankruptcy (as a significant number of furnishers do), Experian would have *never* corrected/scrubbed her Account. Yet, while Experian illuminates its new and improved post-bankruptcy procedures, it simultaneously asks this Court to believe that its procedures, at the time of Plaintiff's bankruptcy, assured maximum (greatest possible) accuracy. This argument is clearly untenable.

### D. Plaintiff Had No Obligation To Personally Notify Defendant Of Her Account's Discharged Status

---

procedures by following "aggressive" reporting procedures, while the other consumer reporting agencies followed more stringent procedures implementing the *White* settlement.

Experian seeks to invent, from whole cloth, a notice requirement for Plaintiff to maintain her claim under 15 U.S.C. § 1681e(b). This requirement is **nowhere** to be found in the statutory scheme or case law, and this Court should not allow Experian to divert the Court's attention away from the present issues before it. *See Morris*, 478 F. Supp. 3d at 769 (D. Minn. 2020) ("[n]otifying the CRA of an inaccuracy is not a prerequisite to asserting a claim under § 1681e(b)."). Experian did not rely on the furnisher, reasonably or otherwise. Rather, Experian independently procured Plaintiff's bankruptcy information, and voluntarily reported this information with actual knowledge of federal law and regulations, which require discharged debts to be reported with zero balances. Thus, Experian has an independent, statutory duty to assure that it follows reasonable procedures when gathering, reporting, and selling consumer information, especially where Experian knew of the default rule regarding unsecured pre-petition debts, such as the debt in this matter. This duty exists with or without a consumer dispute, despite Experian's attempt here to invent a burden on the part of consumers to "discover" inaccuracies and then figure out the dispute process—which is nowhere to be found in the statute in order to give rise to a claim under 15 U.S.C. § 1681e(b).

This is not a case where Experian did not know about the inaccuracy, or where the inaccuracy was not evident on the face of the credit report. For instance, in *Losch v. Nationstar Mortgage LLC, et. al.*, No. 20-01695 (11th Cir. April 28, 2021), the Eleventh Circuit noted this distinction in a case where the consumer rescinded a reaffirmation agreement, and the debt was therefore deemed included in the discharge well after the

fact. *Losch*, 2021 U.S. App. LEXIS 12578, at *17 (the Eleventh Circuit explicitly stated that its "holding is a narrow one" based on the facts).

Experian also recognized that Losch was an atypical circumstance, "[the] case is unique, given Losch's 'confusing and unusual bankruptcy.'" [4] A dispute was only necessary based on the narrow facts of *Losch*, which included a debt that was reaffirmed during the consumer's bankruptcy and then later rescinded. That is not the case here, as there was no rescinded reaffirmation agreement or other after-the-fact event that altered the information Experian received. Experian unquestionably knew about (and reported) Plaintiff's discharge and knew the SFCU Account was included and discharged in Plaintiff's bankruptcy, yet continued to report an amount owed for indisputably discharged pre-petition debt. Consumer disputes are unnecessary in these instances, and why Sec. 1681e(b) exists.

In its motion, Experian argues that "[h]ad Plaintiff simply submitted a dispute, as she had said she would, this case would never have arisen." *See* Doc. 89 at 12. First, as already discussed, **this Court and others have already held in similar cases that a dispute is NOT required to bring a claim under Sec. 1681e(b)**, making all of

---

[4] The plaintiff in *Losch* disputed this inaccurate information with Experian because Experian would be unaware the mortgage reaffirmation was rescinded absent a dispute or continually reviewing the bankruptcy docket. Experian has repeatedly argued that it is not required to continuously scour bankruptcy dockets in perpetuity. *See* Experian's Motions to Dismiss (all denied after Courts determined that the plaintiffs had plausibly stated claims for relief under 15 U.S.C. § 1681e(b)) in *Morris v. Experian Info. Sols., Inc.*, 0:20-cv-00604-PJS-HB, 2020 WL 4703900; *and Alsibai v. Experian Information Sols., Inc., et al.*, 0:20-cv-00963-ECT-DTS, ECF No. 20. Plaintiff does not dispute this point.

Experian's arguments regarding its invented dispute requirement immaterial. Second, Plaintiff had no understanding of the CRA dispute process and believed her lawsuit to be a dispute of Experian's inaccurate reporting.

> Q.    And before this case, have you ever challenged anything on your credit report?
>
> A.    No.
>
> Q.    So you're not familiar with how to do that. Is that -- is that a correct statement?
>
> A.    Because I don't know how to do this or never done this before?
>
> Q.    To challenge something on your credit report.
>
> A.    Yeah. I've never done it, no.

Ex. E, p. 151:15 – 152:2.

> Q.    Do you know what a dispute means, what it means to dispute? You just described -- you just explained that you didn't know how to do it. Do you really know what it means to dispute something on your credit report?
>
> A.    No.· I -- I -- I don't think I would, no. That's why the lawyers were doing it.
>
> Q.    Okay. Can a lawsuit be a dispute of some -- of something on your credit report?
>
> A.    Yes, because they're in the wrong.

Ex. E, p. 152:15 – 153:8.

Third, Experian's declaration that if Plaintiff had disputed the SFCU Account, "Experian would have updated the account to report as discharged in bankruptcy with no balance" is simply nothing but mere speculation and contradicts how Experian has acted in other matters. Doc. 92, ¶ 29. *See Krmpotich vs. Verizon Wireless, LLC*, et al., 0:21-cv-

00189 (NEB/KMM) (D. Minn.). Although the plaintiff disputed the post-discharge account with Experian on at least two separate occasions, Experian continued to report the inaccurate balance and past due. *Id*. See Doc. 3, ¶¶ 40-59. In addition, Experian recently settled a case with a plaintiff for reporting an account as past due and with balances after her bankruptcy discharge whereby Plaintiff disputed the reporting and Experian failed to correct the accounts. *Alleik v. Experian Information Solutions, Inc. et al.,* 0:20-cv-13036 (MAG/DRG) (E.D. Mich).

Experian also attempts to conflate the reliability of Southpoint Federal Credit Union, with the fact that Plaintiff did not allege her other SFCU Account (*2699) (a small overdraft protection for her checking account which was closed during the bankruptcy) was reported inaccurately. Ironically, a cursory review of Plaintiff's August 30, 2019 Experian credit report shows that Experian was reporting both SFCU Accounts inaccurately. In fact, Experian and Equifax were identically reporting the *2699 Account with a balance and a scheduled payment, despite the Account also being discharged in Plaintiff's bankruptcy.[5] Plaintiff asserted a claim against Equifax for its inaccurate reporting of the *2699 Account, which has since settled.

## 2.   EXPERIAN'S INACCURATE REPORTING DAMGED PLAINTIFF

### A.   Experian's Inaccurate Reporting Caused Actual Damages by Damaging Plaintiff's Creditworthiness

---

[5] Experian also notes that Plaintiff continued making payments on the *2699 Account. This is irrelevant (and untrue). Whether or not Plaintiff continued to make payments, absent a reaffirmation, Experian was required to report the *2699 Account with a zero balance, or as discharged.

Experian makes the absurd argument that its reporting of the SFCU somehow benefited Plaintiff's creditworthiness. In support, Experian contends that a delinquency of thirty, sixty, or ninety days is less harmful to a consumer's creditworthiness compared to a status of discharged in bankruptcy. (Doc. 89 at 12.) Under this premise, the credit report of a recently discharged consumer would benefit if ninety percent of the discharged accounts reported accurately, while the other ten percent reported as thirty, sixty or ninety days late. Practically speaking, this could not be further from the truth.

> [T]he "status" of "30-, or 60- or 90-days past due" constituted a recent derogatory under the FICO scoring model, and consequently, lowered her FICO score. It is important to note that under the FICO scoring model, a consumer like Plaintiff who has a bankruptcy on her credit report is analyzed more critically than other consumers who do not have a bankruptcy. Thus, the appearance of a past-due/derogatory tradeline subsequent to a bankruptcy, as occurred on Plaintiff's reports, constitutes a type of 'double whammy,' which deprived Plaintiff of the "fresh start" to which she was entitled.

(Ex. D, Hendricks Expert Report, p. 3.)

Experian next argues that debts reporting as less than 120 days delinquent are viewed as minor delinquencies and are not considered derogatory in many credit-scoring models. (Doc. 89, p. 12.) Oppositely, Experian argues, debts that are more than 120 days delinquent are view as major delinquencies. *Id.* Again, this is patently false. *See* Consumer Fin. Prot. Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System 12 (Dec. 2012), http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf (illustrating that a **30 day** delinquency can cause a 60-110 point drop in a

consumer's FICO credit score—which 90% of lenders use)[6]. More importantly, even assuming Experian's statement is accurate–that only debts over 120 days delinquent are considered in credit-scoring models (not true)–Experian itself admits that it corrected the reporting of Plaintiff's SFCU Account on October 7, 2019, **only after it was reporting as 150 days delinquent**. (*See* Doc. 92, Cave Decl. ¶ 27.) ("[T]he *3776 account was updated to report as discharged in bankruptcy with no balance because it was reporting as 150 days late, and therefore qualified under the scrub logic.").

Moreover, Experian appears to disagree with itself on what constitutes "derogatory." *See* The Experian Team, *What Derogatory Means On Your Credit Report*, Experian.com (February 20, 2018), https://www.experian.com/blogs/ask-experian/what-derogatory-means/ ("Most commonly, the term derogatory refers to accounts that are 60 or 90 days past due or more. . . If you have a derogatory item in your credit history, it can have a substantially negative impact on your credit scores and your ability to qualify for new credit.").

Additionally, Experian knows that the amount of reported debt **is "directly related to multiple factors"** that affect consumer credit scores, credit applications, and credit terms:

> Your debt-to-income ratio (DTI) compares the total amount you owe every month to the total amount you earn. **Lenders may consider your debt-to-income ratio in tandem with credit reports and credit scores when weighing credit applications.**

---

[6] Experian also cites to this report to support its contention that a bankruptcy causes harm to a consumer's credit score. Plaintiff does not dispute this and has not argued to the contrary. Nonetheless, this fact cannot shield Experian from its legal obligations under the FCRA.

Your income is not included in your credit report, so your DTI never affects your credit report or credit score. **However, many lenders calculate your DTI when deciding to offer you credit. That's because DTI is considered an indicator of whether you'll be able to repay a loan. If you have a low DTI, meaning you make much more than you owe, you might be better able to repay a new loan. However, if you already have a lot of debt, taking out additional credit might make it difficult for you to meet your financial obligations.**

Since income does not appear on your credit report and is not a factor in credit scoring, your DTI ratio doesn't directly affect your credit report or credit scores. **However, while your income is not reported to credit bureaus, the <u>amount of debt you have is directly related to multiple factors that do</u> affect your credit scores, including your credit utilization ratio**. This ratio compares your total revolving debt (such as credit cards) with the total amount of credit you have available. Credit utilization ratios are important factors in determining many credit scores.

Other ways your debt can affect your credit scores include:

- **The <u>total amount of debt</u> you have**

*See*   https://www.experian.com/blogs/ask-experian/credit-education/debt-to-income-ratio/ (last accessed May 11, 2021).[7]

In fact, Experian encourages the creditors who purchase consumer reports from Experian to calculate consumer debt-to-income ratios to make credit decisions based on the amount of debt reported in Experian's credit reports:

Determine a customer's overall creditworthiness by accessing a debt-to-income ratio **based on the outstanding debt obligations from their credit report** as compared to their estimated income. Debt-to-Income Insight[SM] leverages the predictive power of Income InsightSM, Experian's premier income estimation model built using verified income data and

---

[7] To the extent necessary, Plaintiff respectfully asks the Court to take judicial notice of information quoted **directly** from Experian's public website.

market-leading credit attributes. It provides an all-in-one assessment of a customer's capacity to take on additional debt.

*See https://www.experian.com/consumer-information/debt-to-income-insight (last accessed May 11, 2021).*

Experian **also** knows there are additional consequences to inaccurately reporting the amount of debt specific to consumers following a bankruptcy discharge that, like Plaintiff, often have minimal or no credit use/utilization except the inaccurately reported balance/amount owed.

> **Amounts owed. Your credit usage, particularly as represented by your credit utilization ratio, is the next most important factor in your credit scores**. Your credit utilization ratio is calculated by dividing the total revolving credit you are currently using by the total of all your revolving credit limits. This ratio looks at how much of your available credit you're utilizing and can give a snapshot of how reliant you are on non-cash funds. **Using more than 30% of your available credit is a negative to creditors. Credit utilization accounts for 30% of your FICO® Score.**

*See https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-affects-your-credit-scores/ (last accessed March 19, 2021).*

Nevertheless, Experian misrepresents that the inaccurately reported "late" and "past due" Account at an 83% credit utilization was somehow positive. At some point, credibility must take precedence. Accordingly, Plaintiff presents evidence from which a reasonable trier of fact could conclude that Plaintiff suffered damages.

## B. Plaintiff Suffered Further Actual Damages As A Result of Experian's FCRA Violation

There is no dispute that Experian reported Plaintiff's SFCU Account **inaccurately** after Plaintiff's discharge. Experian inaccurately and impermissibly reported a discharged debt as past due with outstanding and past due balances after Plaintiff's bankruptcy

discharge. Although a bankruptcy discharge does not negate an Account's payment history preceding the bankruptcy filing, it is patently inaccurate to report a discharged account as open, with past and current balance due, and past due legends in the account's payment history–for months *following* the discharge–when the consumer had no obligation to make payments. Experian's repetitive, misleading, and patently false assertion that its inaccurate reporting is somehow consumer-friendly flies in the face of common sense and does not justify Experian's noncompliance with the FCRA.

Experian further contends that Plaintiff failed to prove that Experian caused her actual damages for three reasons. Plaintiff will address each in turn. First, Experian argues there is no evidence that Plaintiff was denied credit based on Experian's reporting of the SFCU Account. In support, Experian falsely claims that the only evidence showing a credit denial is Plaintiff's hearsay deposition testimony. Plaintiff stated in her deposition that she was denied credit with Chase. (Ex. E, Plaintiff's Deposition Testimony, p. 7:5-12). While Plaintiff is not in possession of Chase's denial letter, Plaintiff's August 30, 2019 Experian credit report shows a "hard inquiry" by Chase on August 7, 2019 for a credit application. (Doc. 91-1, Experian Report, p. 12). Counsel therefore subpoenaed Chase for all documents related to Plaintiff's credit application. (*See* Ex. F, Subpoena to Produce Documents.) In response, Chase, which obtained an Experian report in making its credit decision, produced a data screen confirming that Chase received a credit application from Plaintiff during the period of Experian's inaccurate reporting. (*See* Ex. G, Chase Response to Subpoena). Thereafter, Plaintiff produced these documents to Experian, bates stamped PETERSON-CHASE000001-

000004. (Ex. G.) Importantly, while Chase could not produce a denial letter, the absence of a Chase credit account on Plaintiff's subsequent credit reports clearly demonstrate that Plaintiff's application was denied, and was denied based on the inaccurate information in the Experian report. However, at a minimum, there is a question of fact reserved for the jury, as proof of the credit inquiry from Chase to Experian, the inaccuracy contained in the Experian report, and Chase's subsequent decision not to extend credit to Plaintiff permit the reasonable inference that this was based on the inaccurate information about Plaintiff Chase received from Experian. *See, e.g., Losch v. Nationstar Mortgage LLC, et. al.*, No. 20-01695, at *13-14 (11th Cir. April 28, 2021) (drawing reasonable factual inferences in plaintiff's favor at summary judgment and finding that evidence of inquiries on plaintiff's credit report is sufficient to show that the report was sent to third parties, establishing concrete injury; "Losch needn't show that the false reporting caused his credit score to plummet; the false reporting itself was the injury."). *Id*. at *7.

Next, Experian deliberately misstates statements made by Plaintiff in her deposition to fit its false narrative that Plaintiff's bankruptcy was the sole reason for all credit denials. A reading of Plaintiff's deposition clearly illustrates that Plaintiff only attributed her bankruptcy to the Scheels and American Eagle credit denials, and not to the Chase denial:

A.    I believe -- I believe so. And then I did a Scheels store, the sporting goods store, and an American Eagle store for clothing when I went school shopping. You just get a discount when you apply and it would really help with four kids.

Q.    Of course.

A.      But I got -- but I got denied for both of them, too. And that's it

Q.      Was that recently for those?

A.      Yes, that was -- yeah, when we went school shopping I would say --I think the end of July

Q.      Now, usually, you know, when you apply for a credit card and get denied, they give you a denial letter or it shows up on the screen. Did you get anything like that?

A.      Nope, it just said denied.

Q.      It said denied. You don't have any documents that say why it was denied or what credit, you know Bureau they with check with or anything like that?

A.      It said denied because of bankruptcy.

(Ex. E, p. 9:2-10:2). Importantly, Scheels and American Eagle did not even obtain Experian credit reports during Plaintiff's applications, so those denials are not relevant to Plaintiff's claims against Experian. (Doc. 91-1, Experian Report, p. 12 – showing no hard inquiries for Scheels or American Eagle).

Finally, Experian contends that Plaintiff's testimony is insufficient to establish emotional distress damages. However, this is not the law of the Eighth Circuit. In addition to the direct harm to Plaintiff's reputation, and her reduced access to credit, both of which constitute harm under the FCRA,[8] Plaintiff suffered further actual

---

[8] *See Hurocy v. Direct Merchants Credit Card Bank, N.A., 371 F. Supp. 2d 1058, 6 (E.D. Mo. 2005)* ("Actual damages under the FCRA may include damages…for injury to reputation and creditworthiness."); *Hrebal v. Seterus, Inc.*, 598 B.R. 252, 267 (D. Minn. 2019) ("A denial of credit or higher interest rates resulting from a ... credit report can constitute actual damages under the FCRA.")

damages in the form of emotional distress and mental pain and anguish, including anxiety and depression. (Ex. E, 50:5-17, 124:5-125:17).

As this Court has noted, "emotional distress is actionable under the FCRA" and "may be established solely by a plaintiff's own testimony [which] must show a 'concrete' and 'genuine' issue." *Dao v. Cellco P'ship*, No. 14-1219 (JRT/BRT), 2015 WL 7572304, at *5 (D. Minn. Nov. 24, 2015) (citing *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 828 (8th Cir. 2013); *Edeh v. Equifax Info. Servs., LLC*, 974 F. Supp. 2d 1220, 1244 (D. Minn. 2013), aff'd, 564 F. App'x 878 (8th Cir. 2014)) (further citation omitted). *See* also *Bakker v. McKinnon*, 152 F.3d 1007 (8th Cir. 1998) (plaintiffs' failure to produce any actual out-of-pocket expenses or costs incurred as result of defendant's willful conduct did not preclude award of actual and punitive damages for FCRA violations, where plaintiffs testified about how they felt when defendant obtained their credit reports and violated their privacy, thereby causing them some emotional distress.); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-35 (8th Cir.1976) (awarding actual damages under the FCRA based on claims of emotional distress only); *Stevenson v. TRW Inc.*, 987 F.2d 288, 296-97 (5th Cir.1993) (emotional distress damages may include damages for embarrassment, humiliation and mental anguish); *Graham v. CSC Credit Services, Inc.*, 306 F.Supp.2d 873, 880 (D.Minn.2004) (plaintiff's testimony regarding frustration, anxiety, and humiliation raised a sufficient issue of fact regarding whether he suffered emotional distress to survive a motion for summary judgment.); *Meyer v. F.I.A. Card Services, N.A.*, 780 F.Supp.2d 879, 885 (D.Minn. 2011) ("Emotional distress is, by its nature, extremely subjective, and often the only evidence

of emotional distress will be the testimony of the distressed person.") (further citation omitted); *Cathcart v. Am. Exp. Co.*, No. 4:11-CV-2125-JAR, 2014 WL 5320236, at *5 (E.D. Mo. Oct. 17, 2014) ("[O]bjective evidence of emotional distress is not always required before a plaintiff may recover.").

Experian cites cases where the court granted summary judgment because the plaintiffs in those cases either did not establish a connection between any inaccuracy and resultant distress or did not have a genuine injury. *See Dao* (plaintiff only asserted general/vague allegations of emotional distress, and finding inaccuracy was not related to an alleged breakup between plaintiff and his fiancée based on timeline of events); *Edeh* (plaintiff's conclusory testimony about temporary "concern and "frustration," "disappointment," "embarrassment," and one night's lost sleep deemed insufficient)[9], *Reed*, 321 F. Supp. 2d 1109. None of the foregoing is the case here.

Here, Plaintiff testified about her injuries and harm, including increased anxiety and depression, for which she received medical attention and counseling.  (Ex. E, 27:9-13, 49:13-57:13, 124:8-125:20.) *See also* Declaration of Christa Peterson ("Plaintiff's Decl."), ¶¶ 2-3, 8-11.

> Q.    And I know you mentioned -- you said that the medication wasn't doing enough and that's why you needed to get therapy. Were you being treated for depression and anxiety with some medicines before this?
>
> A.    Yes.

---

[9]    The court also found that based on the evidence in the record, the credit denials were indisputably not caused by the alleged inaccuracy. *Edeh* at 1244.

Q.    And were you on those before you ever filed bankruptcy?

A.    Yes.

Q.    Has any of that -- have any of your prescriptions, you know, changed in the last year as far as -- as far as the antidepressants and those sorts of things?

A.    Yes.

Q.    How – how have they changed?

A.    They've been upped. My prescription – she's put me on different prescriptions.

(Ex. E, p. 54:9-55:2.)

Q.    . . . And have you specifically discussed, you know, this case with your counselor?

A.    Yes.

(Ex. E, p. 55:20-23.)

Q.    And my question is I'd like to you to explain to me how that specifically relates to Experian's conduct.

A.    To know that when I was discharged and then when they got ahold of me to -- to say that I wasn't free, I still had these debts, it was like it all slapped me back in the face again, like it's just -- it's never ending. I just want -- I want to let it go. I -- I – I don't need it. It's like taking two steps forward and one back. I just wanted to start over. I -- it was like now what do I got to do· And to have to go through all this for one day. It -- it just -- it's a nightmare. I -- I -- I don't want any part of it. It's -- it's stressful.

(Ex. E, p. 124:5-20).

Q.    Did you feel slapped in the face, to use your, you know, phrase there, by the accounts that were reporting, you know, as discharged or just this one [Southpoint] account?

A.    Just to find out about just this one account that they didn't get, to know that I am not free, that my debt did not get cleared through the bankruptcy. That is not my fault.

(Ex. E, p. 124:9-17).

Indeed, this District was presented with nearly identical circumstances in *Barton v. Ocwen Loan Servicing LLC*, Civil No. 12-162 (MJD/JJG) (D. Minn. Oct. 25, 2013), where the plaintiff testified about her damages during a deposition and through the submission of a declaration. *Id.* at *12-13. The plaintiff testified that she suffered actual damages through the denial a car loan, as well as resultant physical emotional distress, which included becoming distraught, sleepless nights, and interference with family activities. *Id.* Accordingly, the court held plaintiff sufficiently demonstrated genuine issues of fact regarding actual damages. Plaintiff here also alleges that the continued inaccurate reporting of the SFCU account by Experian caused issues in her relationships with her four children and her boyfriend, and that she started to take medication to help her sleep, in addition to requiring additional medication and counseling for her increased anxiety and depression. *See* Decl. Plaintiff ¶¶ 8-11.

### 3. GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER EXPERIAN'S FCRA VIOLATIONS WERE WILLFUL PRECLUDE SUMMARY JUDGMENT

Experian's arguments pertaining to willfulness are nonstarters. Experian contends it relied on SFCU for this inaccurate reporting, but Experian knew that Plaintiff obtained a discharge, yet continued to inaccurately report the debt.

Experian also contends that its procedures followed were dictated by a "binding" court order, and therefore, Plaintiff's willfulness claim should be dismissed.  This is also not a viable contention. As noted, *White* is not applicable, and certainly did not "dictate" the reporting of outstanding balances/amounts owed for debts discharged through

Plaintiff's Chapter 7 bankruptcy. *White* describes "Agreed Bankruptcy Coding" terminology but does not (and could never) permit Experian to report inaccurate credit information in violation of 15 U.S.C. § 1681e(b).

After voluntarily seeking Plaintiff's bankruptcy information and including this in his credit file, Experian inaccurately reported the discharged SFCU account as "open" with delinquent outstanding balances and scheduled monthly payments.

> Numerous federal courts have already held that the *White* settlement lends plausibility to Plaintiff's allegation that Experian have been on notice of a **systematic problem** of inaccurate reporting of accounts post-bankruptcy: [T]he *White* settlement makes clear [that] the CRAs knew that unsecured consumer debts . . . are typically discharged in Chapter 7 proceedings. Moreover, the *White* settlement itself provides notice that not updating such accounts after a Chapter 7 bankruptcy may fail to comport with § 1681e(b).

*Gibson,* 2020 LEXIS 189258, at *6 at (citing *Morris*, 2020 WL 4703900, at *3).

Additionally, Experian had actual notice of Plaintiff's bankruptcy, as evidenced by reporting of the case number, filing date, and in TransUnion's case, the discharge date in the public records sections of the reports. Experian also reported Plaintiff's other unsecured debts as included/discharged in Chapter 7 Bankruptcy, which further proves Experian **knew** Plaintiff received a Discharge Order. Despite having ample notice of Plaintiff's bankruptcy discharge, Experian unjustifiably failed to update or verify the SFCU account after Plaintiff's bankruptcy to indicate that this was discharged and carried no balance.

Experian also had actual notice of the "Default Rule," as embodied by the Bankruptcy Code and FTC Regulations, yet disregards it. Consequently, Experian inaccurately reported the Accounts as if Plaintiff was still responsible for repayment long

after Experian knew the underlying debt was discharged.[10]

These are plausible allegations that support the reasonable inference that Experian knew that Plaintiff's SFCU account had been discharged, and intentionally failed to implement policies that should have resulted in accurately reporting Plaintiff's credit information. This is a recurring theme in this case and others based on the scrub procedures and criteria Experian **chose** to implement (and where a pre-petition balance still reporting after discharge *is not even a factor considered*). Plaintiff therefore plausibly alleges a "knowing violation" of the FCRA, which reviewing courts accept as true on a Rule 12(b)(6) Motion. *See also Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 56-57, 68 (2007) (willful violation requires an intentional or reckless act; act is reckless when it entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known.").

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny Experian's motion for summary judgment regarding willfulness.

## V.   <u>CONCLUSION</u>

Having relied almost entirely upon an inapplicable, nonbinding class action settlement (as already held by this Court) to prove its procedures were reasonable beyond question, Experian has failed to meet its burden as movant for summary judgment. The record reflects Experian's procedures for reporting consumer accounts after receiving notice of a Discharge Order were unreasonable at the time of Plaintiff's bankruptcy

---

[10]   Experian's knowledge that the debt was indisputably discharged also distinguishes this case from *Losch*, where Experian was initially unaware that the reaffirmation agreement was rescinded after-the-fact and sought to verify this with the furnisher.

discharge. At a minimum, genuine issues of material fact preclude summary judgment, making this case appropriate for resolution by a reasonable jury at trial.

Respectfully submitted this 17th day of May 2021.

s/Dawn M. McCraw
Dawn M. McCraw
Bar Number: 035321
(admitted pro hac vice)
Attorney for Plaintiff Christa Peterson
Price Law Group, APC
8245 N 84th Way
Scottsdale, AZ 85258
Telephone: (818) 600-5585
Email: dawn@pricelawgroup.com

David A. Chami
Bar Number: 027585
(admitted pro hac vice)
Attorney for Plaintiff Christa Peterson
Price Law Group, APC
8245 N 85th Way
Scottsdale, AZ 85258
Telephone: (818) 600-5515
Email: david@pricelawgroup.com

Christopher Dunn
Bar Number: 0400686
Attorney for Plaintiff Christa Peterson
Hoglund, Chwialkowski & Mrozik, PLLC
1781 Country Road B West
Roseville, Minnesota 55113
Telephone: (651) 628-9929
Email: chip.dunn@hoglundlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter.

*/s/Jacey Gutierrez*